## TRENOUTH v. SAN FRANCISCO.

1. The history of the title of San Francisco to her municipal lands stated.
2. The act entitled "An Act to quiet the title to certain lands within the corporate limits of the city of San Francisco," approved March 8, 1866 (14 Stat. 4), confirmed her claim, in trust that certain lands should be disposed of and conveyed to parties in the *bona fide* actual possession thereof, by themselves or tenants, on the passage of the act. *Held*, that trespassers then in possession of the lands, who were afterwards ejected therefrom at the suit of those upon whose prior possession they had intruded, are not beneficiaries under the act; but that the parties who so recovered the possession are entitled to a conveyance from the city.
3. A party cannot initiate a pre-emption right to public land by intrusion upon the actual possession of another; nor by settling upon land in California, a claim to which, under a foreign title, is at the time pending before the tribunals of the United States for confirmation.

ERROR to the Supreme Court of the State of California.

The facts are stated in the opinion of the court.

*Mr. Walter Van Dyke* for the plaintiff in error.

*Mr. S. M. Wilson, Mr. Edward Janin,* and *Mr. Edmond L. Goold, contra.*

MR. JUSTICE FIELD delivered the opinion of the court.

This was a suit to charge the defendants as trustees of certain land in the city of San Francisco, and to compel a conveyance of the legal title to the plaintiff. The case is free from difficulty, but to understand the positions of the plaintiff it will be necessary to state briefly the history of the titles to lands in that city.

At the time of the conquest of California by the forces of the United States, on the 7th of July, 1846, there was a Mexican pueblo at the site of the present city of San Francisco. This term "pueblo," in its original signification, means people or population, but is used in the sense of the English word "town." It has the indefiniteness of that term, and, like it, is sometimes applied to a mere collection of individuals residing at a particular place, a settlement or village, as well as to a regularly organized municipality. *Grisar* v. *McDowell*, 6 Wall. 363. The pueblo at San Francisco was a small settlement, but it was of sufficient importance, as early as

1835, to have an ayuntamiento, composed of alcaldes and other officers; and it was under their government for some years. At the time of the conquest, and for some time afterwards, it was under the government of justices of the peace, or alcaldes.

By the laws of Mexico, in force in California on the acquisition of the country, pueblos or towns, when once recognized by public authority, became entitled, for their benefit and that of their inhabitants, to the use of the lands embracing the site of such pueblos or towns and adjoining territory within the limits of four square leagues, to be measured and assigned to them by the officers of the government. Under those laws the pueblo of San Francisco asserted a claim to four square leagues, to be measured off from the northern portion of the peninsula upon which the present city is situated.

The alcaldes of a pueblo exercised the power of distributing the lands of the town in small parcels to its inhabitants for building, cultivation, or other uses, the remainder being generally retained for commons or other public purposes.

When the town of San Francisco was occupied by our forces, citizens of the United States were appointed by the military or the naval commanders to act as alcaldes in the place of the Mexican officers. Upon the sudden increase of population at that place, following the discovery of gold, the alcaldes were called upon for building-lots in great numbers, and those officers distributed them with a generous liberality usually attending the grant of other people's property. Numerous persons, however, arriving at the town were not disposed to recognize the authority in this respect of the American magistrates, and finding it less troublesome to appropriate what land they needed than to apply to the magistrates for it, they asserted that the land on which the pueblo was situated belonged to the United States, and, as evidence of the sincerity of their convictions, immediately proceeded to take as much of it for themselves as they could conveniently enclose and hold. Thus the town was soon filled with an active and restless population, making large and expensive improvements upon lands held in some instances under grants from the alcaldes, and in others by the right of prior possession. Sometimes the same parcel

was claimed by different parties; by one party as a settler, and by another as the holder of an alcalde grant. Disputes both in and out of the courts, the natural consequence of this difference in the origin of the titles of the claimants, were greatly increased in bitterness by the enormous value which in a short period the lands acquired.

In April, 1850, soon after the organization of the State government, San Francisco was incorporated as a city by the legislature. She at once made claim to the lands of the pueblo, as its successor; and, when the board of land commissioners was created under the act of Congress of March 3, 1851, she presented the claim for confirmation. In December, 1854, the board confirmed the claim for only a portion of the four square leagues. Dissatisfied with the limitation of the claim, the city appealed from the decree of the commissioners to the District Court of the United States. The government also appealed, though subsequently it withdrew its appeal. The case remained in the District Court undetermined until September, 1864, a period of nearly ten years, when, under the authority of an act of Congress, that court transferred the case to the Circuit Court, where it was decided in the following October. The decree, finally settled and entered May 18, 1865, confirmed the claim to a tract of land embracing so much of the upper portion of the peninsula upon which the city is situated, above the ordinary high-water mark of 1846, as would contain an area of four square leagues, — the tract being bounded on the north and east by the bay of San Francisco, on the west by the Pacific Ocean, and on the south by a due east and west line, drawn so as to include the area designated, subject to certain deductions, which it is unnecessary to mention here. The lands were confirmed to San Francisco in trust for the benefit of lot-holders under grants from the pueblo, town, or city, or other competent authority, and as to any residue, in trust for the use and benefit of the inhabitants of the city. As already stated, the city was incorporated in April, 1850. The charter she then received was repealed, and a new charter granted in April, 1851. The limits of the city, as defined by this latter charter, embraced an area of over two miles square. The lands lying outside of these charter limits

are designated in the subsequent legislation of the city and State, and frequently in the decisions of the courts, as outside lands.

Pending the appeal of the pueblo claim in the District Court, the city passed an ordinance, known in its history, from the name of its author, as the Van Ness Ordinance, the object of which was to settle and quiet the title of persons holding land in the city. It relinquished and granted all the right and claim of the city to land within the corporate limits as defined by the charter of 1851, with certain exceptions, to parties in the actual possession thereof, by themselves or tenants, on or before the 1st of January, 1855, provided such possession was continued up to the time of the introduction of the ordinance into the common council, or if interrupted by an intruder or trespasser, had been or might be recovered by legal process; and it declared that, for all the purposes contemplated by the ordinance, persons should be deemed possessors who held titles to lands within those limits by virtue of a grant made by any ayuntamiento, town council, alcalde, or justice of the peace of the former pueblo, before the 7th of July, 1846, or by virtue of a grant subsequently made by those authorities, within certain limits of the city, previous to its incorporation by the State, provided the grant, or a material portion of it, had been recorded in a proper book of records in the control of the recorder of the county previous to April 3, 1851. In March, 1858, the legislature ratified and confirmed this ordinance; and on the 1st of July, 1864, Congress relinquished and granted to the city all the interest of the United States to the lands within the corporate limits of 1851, in trust for the uses and purposes of the ordinance. Thus the contention of the different claimants to land within those limits was settled, their titles secured, and the usual result of quieting titles, progress and prosperity, followed.

But appeals were prosecuted to the Supreme Court, both by the United States and by the city, — by the United States from the whole decree, and by the city from so much of it as included the reservations in the estimate of the quantity of land confirmed. Whilst these appeals were pending, and on the 8th of March, 1866, Congress passed an act to quiet the title to

certain lands within the corporate limits of the city.    At this time, the limits had been extended so as to be coincident with those of the county, and embraced the whole of the four square leagues confirmed.    By this act, all the right and title of the United States to the land covered by the decree of the Circuit Court were relinquished and granted to the city, and the claim to the land was confirmed; subject, however, to certain reservations and exceptions, and upon trust that all the land not previously granted to the city should be disposed of and conveyed by the city to the parties in the *bona fide actual possession thereof, by themselves or tenants, on the passage of the act*, in such quantities and upon such terms and conditions as the legislature of the State of California might prescribe, except such parcels thereof as might be reserved and set apart by ordinance of the city for public uses.    The appeals to the Supreme Court were accordingly dismissed.    *Townsend* v. *Greeley*, 5 Wall. 326.    The title of the city to the land within the four square leagues rests, therefore, upon the decree of the Circuit Court, as entered on the 18th of May, 1865, and this confirmatory act of Congress.    By this act, the government expressed its will with respect to the claim of the city, and the conditions upon which it should be recognized and confirmed. As was said by this court, in *Grisar* v. *McDowell*, " in the execution of its treaty obligations with respect to property claimed under Mexican laws, the government may adopt such modes of procedure as it may deem expedient.    It may act by legislation directly upon the claims preferred, or it may provide a special board for their determination, or it may require their submission to the ordinary tribunals.    It is the sole judge of the propriety of the mode; and, having the plenary power of confirmation, it may annex any conditions to the confirmation of a claim resting upon an imperfect right which it may choose.    It may declare the action of the special board final; it may make it subject to appeal; it may require the appeal to go through one or more courts; and it may arrest the action of board or courts at any stage.    6 Wall. 379.

The title of the city being thus settled, its authorities proceeded under the provisions of the confirmatory act, and reserved and set apart grounds for parks and other public

purposes.   But, as these grounds were in many instances occupied, the city passed an ordinance known as No. 800, subsequently ratified by the legislature, by which a general assessment was levied upon all the lands conveyed to occupants as a condition of receiving deeds from the city, the money thus raised to be applied towards compensating those whose lands were thus taken for public purposes.

Some of the defendants, and parties through whom the others claim, had been in the actual possession of the land in controversy here before the passage of the act of 1866 ; but their possession had been intruded upon by violence, and they driven from the land by parties through whom the plaintiff claims. One of the intruding parties afterwards set up a claim that he entered as a pre-emptioner under the laws of the United States. Subsequently, the excluded parties recovered possession by suit; and the judgment in their favor was affirmed on appeal by the Supreme Court of the State.   They then transferred the property, for the sake of convenience and expedition in securing the title, to one of their number, who applied to the city authorities and obtained a deed of the premises, first paying the assessment levied upon it and the taxes due.   Under this deed the defendants hold the property.   The plaintiff, representing the claims of the intruding and subsequently ejected parties, and insisting that they were beneficiaries under the act of Congress, because upon its passage they were in the actual possession of the property, brought the present suit to charge the defendants as trustees of the legal title for his benefit.   The District Court and the Supreme Court of the State were of opinion that, upon his own showing, his grantors, the intruders mentioned, were never in the *bona fide* possession of the property, within the meaning of the act of Congress ; and we agree with them in this respect.   The claim of one of the intruders as a pre-emptioner was equally unfounded, — 1st, because the right of pre-emption, under the laws of the United States, cannot be acquired by intrusion and trespass upon lands in the actual possession of others; 2d, because the lands were claimed under a foreign title, — that of the pueblo from Mexico, — the claim to which was then pending before the tribunals of the United States.

The possession obtained by the intrusion and trespass of the plaintiff's grantors constitutes no ground for equitable relief against the holders of the city title; and the assertion of a possession thus obtained has as little merit as the lawless and unjustifiable conduct of the intruders in seizing the property.

*Judgment affirmed.*