# DURAND *v.* MARTIN.

## ERROR TO THE SUPREME COURT OF CALIFORNIA.

Submitted January 13, 1887. — Decided February 7, 1887.

Lands listed to California as indemnity school lands, and patented by the State, are not open to preëmption settlement while in possession of the patentee.

The act of March 1, 1877, 19 Stat. 267, "relating to indemnity school lands in the State of California," was a full and complete ratification by Congress, according to its terms, of the lists of indemnity school selections which had been before that time certified to the State of California, by the United States as indemnity school selections, no matter how defective or insufficient such certificates might originally have been, if the lands included in the lists were not any of those mentioned in § 4, and if they had not been taken up in good faith by a homestead or preëmption settler prior to the date of the certificate.

THIS was an action to recover the possession of land in California, brought, and prosecuted to final judgment, in the courts of that state. The facts which make the Federal case for this court are stated in the opinion of the court.

*Mr. Michael Mullany* for plaintiffs in error.

*Mr. E. D. Wheeler* for defendant in error.

Mr. Chief Justice Waite delivered the opinion of the court.

This was a suit brought by Samuel B. Martin, the defendant in error, on the 20th of March, 1878, in the District Court of Contra Costa County, California, against Martin Durand and Anthony Thompson, the plaintiffs in error, to recover the possession of the E. ½ sec. 13, T. 2 S., R. 1 E., Mount Diablo meridian. The facts found at the trial were in brief these:

The land in dispute was agricultural land, and it was located by the locating agent of California on the 20th of October, 1862, at the request and in the name of Martin, in lieu of the E. ½ sec. 16, T. 22 S., R. 6 E., of the same meridian. In making this selection, which was for idemnity school lands, the agent acted under color of the authority of § 7 of the act of March 3, 1853, c. 145, 10 Stat. 244, 247. This township twenty-two has never been surveyed by the United States, and the east half of section 16 is within the boundaries of a Mexican grant known as San Miguelito, confirmed to one Gonzales, the final survey of which was approved in 1859, and the lands afterwards patented to Gonzales or his assigns.

On the 2d of March, 1863, the State of California issued a certificate of purchase to Martin for the land in dispute. On the 8th of September, 1870, it was listed to the state by the United States government, and, on the 3d of February, 1871, it was patented by the state to Martin under his certificate of purchase. The plat of the United States survey of township two, embracing the land, was filed in the United States land office in San Francisco on the 10th of June, 1865.

On the 10th of April, 1839, the Mexican government granted to José Noriega and Robert Livermore, a tract of land known as Las Pocitas. The claim under this grant was confirmed on the 14th of February, 1854, by the land commissioners appointed under the act of March 3, 1851, c. 41, 9 Stat. 631,

and afterwards, on appeal, by this court, at December Term, 1860. After the decision of the land commissioners, a deputy surveyor, under instructions from the surveyor general of the United States for California, made a survey which purported to show the boundaries of the claim confirmed, and this survey was approved by the surveyor general May 7, 1854, but nothing further appears to have been done under it. In March, 1869, after the decree of confirmation by this court, the surveyor general caused the claim so confirmed to be again surveyed and designated, and this survey was approved by him May 11, 1870, by the Commissioner of the United States General Land Office, March 1, 1871, and by the Secretary of the Interior, June 6, 1871. On the 20th of August, 1872, the United States issued a patent to Noriega and Livermore, their heirs and assigns, for the land so surveyed and designated in March, 1869. The land now in dispute was embraced within the exterior boundaries of the grant adjudged to be valid by the decree of the board of land commissioners affirmed by this court, but was not embraced within the surveys of 1854 or 1869, or in the patent issued to Noriega and Livermore.

On the 16th of May, 1876, Thompson entered into the possession of the south half and Durand into the possession of the north half of the half-section in dispute. When these entries were made Martin was in possession of the land, though it was not then, nor had it ever been, fully enclosed or fenced. Within a few days afterwards Martin notified Thompson that he claimed to own the land under a patent from the State of California, which he exhibited; but, notwithstanding this, both Thompson and Durand maintained actual and exclusive possession, and kept Martin out until this suit was brought. Each of the parties entered for the purpose of availing himself of the preëmption laws of the United States, having the necessary personal qualifications therefor. They each made application at the proper land office to perfect their respective claims, but the officers refused to permit them to do so. Upon this state of facts the Supreme Court of California affirmed a judgment of the District Court in favor of Martin, and to reverse that decision this writ of error was brought.

Upon the facts as found we have no hesitation in deciding that the title of Martin, under his patent from the State of California, was perfect when his suit was brought, and that the judgment in his favor was right. The land in dispute had not only been selected by the state as indemnity school lands, and certified or listed as such by the proper officer of the United States, when Durand and Thompson made their respective entries as preëmption settlers, but it had been patented to Martin and he was in actual possession under color of that title. These are facts specially found by the court below, and the evidence on which this finding was made cannot be considered here. Such being the case, the land was not open to preëmption settlement as against Martin when Durand and Thompson entered on his possession. *Atherton* v. *Fowler*, 96 U. S. 513; *Trenouth* v. *San Francisco*, 100 U. S. 251, 256; *Mower* v. *Fletcher*, 116 U. S. 381.

If the title of Martin was ever at all defective, it was because at the time of the selection the land was within the boundaries of a claim under a Mexican grant, and therefore not then, in a strict legal sense, public land; but the United States have never objected to the title of the state because of this. On the contrary, after a survey had been made and approved by the surveyor general of the United States for California, which excluded the land from the grant, the proper officer of the United States listed it to the state under the act of August 3, 1854, c. 201, 10 Stat. 346, now § 2449 of the Revised Statutes, as indemnity school lands which had been properly selected, and from that day to this, so far as the record shows, the United States have never disputed the title of the state or its grantee. This survey was made in 1869, the claim having been finally confirmed in 1860. As the survey was not made until more than ten months after the act of July 23, 1866, c. 219, 14 Stat. 218, "to quiet land titles in California" had become operative, its approval by the surveyor general had the effect, under the ruling of this court in *Frasher* v. *O'Connor*, 115 U. S. 102, of opening all lands within the exterior boundaries of the grant, but outside of those fixed by the survey, to selection or preëmption entry as public lands, subject only to a

defeat of title, if in the end the survey as made s uld be set aside and the boundaries of the grant finally extended so as to include the selection or the entry. In the present case, however, the survey was accepted by the owners of the grant and a patent taken for the land within its boundaries, in full satisfaction of their original claim as confirmed by the commissioners and by this court. This was in 1872, and from that time certainly there has been no one, according to this record, who could dispute the title of the state or its grantee, except the United States. The owners of the Mexican grant abandoned their claim to the excluded land when they accepted their patent, and no one could enter upon the land by the laws of the United States as a preëmption settler, because Martin was in the actual possession under his claim of title. It is not contended that this title of Martin is even technically defective, unless it be for the reason that the selection was actually made when the land was not in law public land. But when the Commissioner of the General Land Office in 1870 certified this with other land to the state as land which had been selected as indemnity lands, it was an existing selection at that date, and there were no intervening rights to prevent its operation as such. By accepting the certificate, the state treated the selection as a valid selection existing at the time of the certificate, and the list thus certified operated under the act of 1854 as a transfer of the title from the United States to the state which immediately inured to the benefit of Martin under his patent. It is true that the certificate of the Commissioner to a list of lands which were not open to selection at the time they were selected, nor at the time they were certified, would not pass title out of the United States because he had no authority in law to make such a certificate. But the case is quite different when the state presents for certification as an existing selection one that was bad when made but good when presented. Under such circumstances, if the rights of no third parties have intervened, there is nothing to prevent the Commissioner from treating the selection as if made on the date of its presentation, and certifying accordingly. His certificate is of selections claimed by the state at the time of its

date, and if the state had a right to the title under the circumstances existing then, it was within his official authority to make the transfer. It is a matter of no moment that the selection was bad at the time it was made, if at the time of its presentation for title it was good, and there were no intervening rights to be injured by reason of its acceptance and ratification by the United States.

This would be sufficient to sustain the title of. Martin if there were nothing more. But there is more. All must agree that, even if the title was defective because of the invalidity of the original selection, it was within the power of the United States to cure such a defect by a release to the state or its grantee of all their interest in the land remaining after the lists were certified by the Commissioner of the Land Office, provided no other person had in the meantime acquired rights superior to those of Martin. This, we think, was done by the act of March 1, 1877, c. 81, 19 Stat. 267, "relating to indemnity school selections in the State of California." That act is as follows:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the title to the lands certified to the State of California, known as indemnity school selections, which lands were selected in lieu of sixteenth and thirty-sixth sections, lying within Mexican grants, of which grants the final survey had not been made at the date of such selection by said state, is hereby confirmed to said state in lieu of the sixteenth and thirty-sixth sections, for which the selections were made.

"Sec. 2. That where indemnity school selections have been made and certified to said state, and said selection shall fail, by reason of the land in lieu of which they were taken not being included within such final survey of a Mexican grant, or are otherwise defective or invalid, the same are hereby confirmed, and the sixteenth or thirty-sixth section, in lieu of which the selection was made, shall, upon being excluded from such final survey, be disposed of as other public lands of the United States: *Provided*, That if there be no such sixteenth or thirty-sixth section and the land certified therefor shall be

held by an innocent purchaser for a valuable consideration, such purchaser shall be allowed to prove such facts before the proper land office, and shall be allowed to purchase the same at one dollar and twenty-five cents per acre, not to exceed three hundred and twenty acres for any one person : *Provided,* That if such person shall neglect or refuse, after knowledge of such facts, to furnish such proof and make payment for such land, it shall be subject to the general land laws of the United States.

" SEC. 3. That the foregoing confirmation shall not extend to the lands settled upon by any actual settler claiming the right to enter, not exceeding the prescribed legal quantity under the homestead or preëmption laws: *Provided,* That such settlement was made in good faith upon lands not occupied by the settlement or improvement of any other person, and prior to the date of certification of said lands to the State of California by the Department of the Interior: *And provided further,* That the claim of such settler shall be presented to the register and receiver of the district land office, together with the proper proof of his settlement and residence, within twelve months after the passage of this act, under such rules and regulations as may be established by the Commissioner of the General Land Office.

" SEC. 4. That this act shall not apply to any mineral lands, nor to any lands in the city and county of San Francisco, nor to any incorporated city or town, nor to any tide, swamp or overflowed lands."

This statute was, in our opinion, a full and complete ratification by Congress, according to its terms, of the lists of indemnity school selections which had been before that time certified to the State of California by the United States as indemnity school selections, no matter how defective or insufficient such certificates might originally have been, if the lands included in the lists were not of the character of any of those mentioned in § 4, and if they had not been taken up in good faith by a homestead or preëmption settler prior to the date of the certificate. The history of the times, which is exemplified by the facts of this case, shows that such must have been the in-

tention of Congress. Almost from the beginning many of the titles under these indemnity selections had been in doubt because of the delay which attended the settlement of Mexican claims, and the records of this court contain a large number of cases in which claimants under the preëmption and homestead laws of the United States have sought to establish their titles, as against purchasers from the state under indemnity selections who had been many years in possession, because of some real or supposed defect in the title of the state. This statute was passed twenty-three years after the original grant to the state of the right to select indemnity lands for lost school sections, and more than fourteen years after the lands now in dispute had been selected by the state under this grant and sold to Martin. Eight years before the statute the proper officer of the United States had made a certificate which, if authorized by law, transferred an absolute estate in fee simple to the state that enured at once to the benefit of Martin. This certificate had never been disputed by the United States, and no attempt had ever been made by any one in authority to set it aside. This, as we know from our own records, is but one of many cases of a similar character, and, read in the light of these facts the statute has to us no uncertain meaning.

In its first section all such certificates are expressly confirmed where the only objection to their validity is that a selection was made before the Mexican grant within which the original school section was actually situated had been surveyed, and the survey finally approved. In this class of cases the state was entitled to its indemnity lands, and the United States in effect formally waived any and all irregularities in making the selections.

In the second section cases were provided for in which the selection failed: 1, because the school section in lieu of which indemnity was claimed and taken was not actually within the limits of a Mexican grant; and, 2, because it was "otherwise defective or invalid." This language is certainly broad enough to include every defective certificate; and, in order that the United States might be protected from loss, it was provided that, if the sixteenth or thirty-sixth section, in lieu

of which the selection was made, should be found outside the Mexican grant, the United States would accept that in lieu of the selected land, and confirm the selection. If, however, there was no such sixteenth or thirty-sixth section, and the land certified was held by an innocent purchaser from the state for a valuable consideration, such purchaser would be allowed to purchase the same from the United States at the rate of one dollar and twenty-five cents per acre, not exceeding three hundred and twenty acres for any one person.

The statute relates only to such selections as had been certified to the state, and, taken as a whole, it meets the requirements of all the cases of defective selection which could be so certified. These are: 1. Cases where the state was entitled to indemnity, but the selection was defective in form; 2. Cases where the original school sections were actually in place, and the state was not entitled to indemnity on their account; and 3. Cases where the state was not entitled to indemnity, because there never had been such a section sixteen or section thirty-six as was represented when the selection was made and the official certificate given. As to the first of these classes, the certificate was simply confirmed because the state was entitled to its indemnity, and nothing was needed to perfect the title but a waiver by the United States of all irregularities in the time and manner of the selections. As to the second, the selection was confirmed, and the United States took in lieu of the selected land that which the state would have been entitled to but for the indemnity it had claimed and got. In its effect this was an exchange of lands between the United States and the state. And as to the third, in lieu of confirmation, *bona fide* purchasers from the state were given the privilege of perfecting their titles by paying the United States for the land at a specified price. Under these circumstances, it was a matter of no moment to the United States whether the original selection was invalid for one cause or another. If the state was actually entitled to indemnity, it was got, and the United States only gave what it had agreed to give. If the state claimed and got indemnity when it ought to have taken the

original school sections, the United States took the school sections and relinquished their rights to the lands which had been selected in lieu. And if the state had claimed and sold land to which it had no right, and for which it could not give school land in return, an equitable provision was made for the protection of the purchaser by which he could keep the land, and the United States would get its value in money. In this way all defective titles, under the government certificates, would be made good without loss to the United States.

It may be, as was claimed in argument, that when the bill was originally prepared the framer had it in mind only to provide for selections made in lieu of school sections within Mexican grants before the final survey of the grants, and for selections made in lieu of sections not finally included within the survey of a grant; but to our minds it is clear that before the bill finally became a law, Congress saw that, as ample provision had been made for the protection of the United States in all cases, it was best to include all certificates which were defective, no matter for what cause, and so the words "or are otherwise defective or invalid" were added in what seemed to be the most appropriate place to carry that purpose into effect. No selection was made good unless it had been certified, and not then unless the United States got an equivalent either in land or in money, or in carrying out their original school-land grant. In this way the titles of all bona fide purchasers from the state were or could be perfected without loss to the United States, and that, we have no doubt, was the intention of Congress when the statute was enacted.

It is true that Durand and Thompson had entered on the land, and had excluded Martin from the possession, before the statute was passed, but that gave them no rights either under this statute or any other. As we have already shown, their entry was of no avail under the general preëmption laws, and this statute saves the rights of no homestead or preëmption settlers, except such as had entered on the lands in good faith prior to the date of their certification to the state.

*The judgment is affirmed.*