LYLE v. PATTERSON et al.

(Circuit Court of Appeals, Eighth Circuit. February 21, 1910.)

No. 2,996.

1. PUBLIC LANDS (§ 31*)—HOMESTEAD ENTRY—CONFLICTING CLAIMS—POSSESSION OBTAINED BY TRESPASS.

A person cannot initiate a right of homestead by settling upon land at the time in the actual possession of another, who purchased it in good faith and for full value from a railroad company in the erroneous belief that the company was the owner, which will give him standing in a court of equity to contest the entry of such actual occupant to whom the land was awarded by the Land Department.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 53; Dec. Dig. § 31.*]

2. PUBLIC LANDS (§ 138*)—SUIT TO CONTEST HOMESTEAD ENTRY—BONA FIDE PURCHASER.

One claiming the right to enter as a homestead land awarded by the Land Department to another cannot assert such right as against a bona fide purchaser from the entryman after patent and without notice of such claim.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 368; Dec. Dig. § 138.*]

Appeal from the Circuit Court of the United States for the Northern District of Iowa.

Suit in equity by Roscoe Lyle against George M. Patterson and others. Decree for defendants (160 Fed. 545), and complainant appeals. Affirmed.

---

· Edwin J. Stason (Madison B. Davis, on the brief), for appellant. ·
W. D. Boies, for appellees.

ᴵ Before SANBORN, Circuit Judge, and RINER and WM. H. MUNGER, District Judges.

WM. H. MUNGER, District Judge. This case was tried in the court below upon an agreed statement of facts, from which it appears that on May 12, 1864, Congress passed an act (Act May 12, 1864, c. 84, 13 Stat. 72) granting lands to the state of Iowa, to aid in the construction of a railroad, from Sioux City in said state to the south line of the state of Minnesota, at such point as the said state of Iowa may select between the Big Sioux and the west fork of the Des Moines river, also, to said state for the use and benefit of the McGregor Western Railroad Company for the purpose of aiding in the construction of a railroad from a point in South McGregor, in said state, in a westerly direction, by the most practical route, on or near the Forty-Third parallel of north latitude, until it shall intersect the said road running from Sioux City to the Minnesota state line, in the county of O'Brien, in said state, every alternate section of land, designated by odd numbers, for 10 consecutive sections in width on each side of said roads, to which the right of pre-emption or homestead settlement had not attached at the time of the definite location of such roads, and where any such alternate sections, within said 10-mile limit, had been sold or pre-emption or homestead settlements attached at the time of the definite location of the road thereon, the Secretary of the Interior was authorized to select as indemnity therefor other lands in alternate sections within limits of 20 miles of said roads. On April 20, 1866, the General Assembly of the state of Iowa accepted said grant, and on the 19th day of September, 1866, the Sioux City & St. Paul Railroad Company filed in the office of the Secretary of State of Iowa its acceptance of the grant of Congress and the acts of the General Assembly of the state of Iowa, relating thereto, upon the terms, conditions, and limitations therein contained, and on the 27th day of September, 1866, the Sioux City & St. Paul Railroad Company commenced the location of its line of railroad in Sioux City, and on October 4, 1866, completed the location to the southern line of the state of Minnesota, in section 12, township 100 north, range 41 west, of the Fifth P. M. On the 2d of April, 1867, said Sioux City & St. Paul Railroad Company certified to the map of location and filed the same in the office of the Secretary of State of Iowa, which was afterwards certified to by the Governor and Secretary of the State of Iowa, and filed in the office of the Secretary of the Interior of the United States, and the same was duly accepted by the Secretary of the Interior as the basis for the adjustment of the land grant made to the state of Iowa. And the lands so granted to the state of Iowa within the odd-numbered sections within the limits of 20 miles on each side of said road, as located on said map, were withdrawn from sale or entry under the pre-emption and homestead laws, and the price of the even-numbered sections of land within the 10-mile limit was increased to $2.50 per acre. In September, 1867, said

map, together with letter of withdrawal, was received by the register of the Land Office at Sioux City, Iowa.

In 1872 the Sioux City & St. Paul Railroad Company commenced the construction of its railroad from a connection with the St. Paul & Sioux City Railroad at the southern line of the state of Minnesota, at or near the southwest corner of section 31, township 101, range 40, on the southern line of said state of Minnesota, and constructed the same in a southerly direction to the town of Le Mars, in the state of Iowa, but did not construct its road between Le Mars and Sioux City, but operated through trains over another line of road already constructed between said towns. Whenever 10 consecutive miles of road were constructed, the same was duly certified to the Secretary of the Interior, and patents were issued by the United States to the state of Iowa for lands within the limits of the grant opposite the sections so constructed. The Chicago, Milwaukee & St. Paul Railroad Company, by certain acts of the Legislature of the state of Iowa, became the successor of the McGregor Western Railroad Company and completed the construction of its road from McGregor to a point of intersection with the said Sioux City & St. Paul Railroad Company, and in 1879 the Chicago, Milwaukee & St. Paul Railroad Company commenced, in the Circuit Court of the United States for the District of Iowa, an action against the Sioux City & St. Paul Railroad Company and certain officers and trustees of the state of Iowa, to have adjusted the rights to lands within the overlapping limits of the respective railroad companies. Said action was prosecuted through the Circuit and Supreme Court of the United States, and in May, 1886, a decree was entered pursuant to a mandate of the Supreme Court, apportioning the lands between the two companies. The particular lands involved in this action were by said proceedings assigned to the Sioux City & St. Paul Railroad Company. Subsequently the state of Iowa, by its General Assembly, relinquished to the United States all the lands which had not been earned by the railroad companies under said grants.

On March 3, 1887, Congress passed an act entitled "An act to provide for the adjustment of land grants made by Congress to aid in the construction of railroads and for the forfeiture of unearned lands, and for other purposes." Act March 3, 1887, c. 376, 24 Stat. 556 (U. S. Comp. St. 1901, p. 1595). The first section of the act authorized and directed the Secretary of the Interior to immediately adjust in accordance with the decisions of the Supreme Court each of the railroad land grants made by Congress to aid in the construction of railroads, which had not theretofore been adjusted. The second section provided that, upon the completion of said adjustment, if it should appear that lands had been from any cause erroneously certified or patented by the United States for the use or benefit of any company claiming by, through, or under grant from the United States, to aid in the construction of a railroad, the Secretary of the Interior should demand from such company a relinquishment or reconveyance to the United States of all such lands, whether within granted or indemnity limits, and, if any such company should neglect or fail to reconvey within 90 days after

such demand, it was made the duty of the Attorney General to commence and prosecute in the proper courts necessary proceedings to cancel all patents, certifications, or other evidence of title, theretofore issued for said lands, and to restore the title thereof to the United States. By the fourth section of the act it was provided that lands erroneously certified or patented, and which had been sold by the grantee company to citizens of the United States or persons who had declared their intention to become such citizens, the person or persons so purchasing in good faith, heirs or assigns, should be entitled to the lands so purchased upon making proof of the fact of such purchase at the proper land office within such time and under such rules as might be prescribed by the Secretary of the Interior after the grants respectively should have been adjusted and patents of the United States should issue therefor, and should relate back to the date of the original certification or patent, and the Secretary of the Interior, on behalf of the United States, should demand payment from the company which had so disposed of such lands for an amount equal to the government price of similar lands. By section 5 it was provided that, where any company should have sold to citizens of the United States or to persons who have declared their intention to become such citizens, as a part of its grant lands, not conveyed to or for the use of such company, and such lands being the numbered sections described in the grant, and being coterminous with the constructed parts of said roads, and where the lands so sold were for any reason excepted from the operation of the grant to said company, it should be lawful for the bona fide purchaser thereof from said company to make payment to the United States for said lands at the ordinary government price for like lands, and thereupon patents should issue therefor to said bona fide purchaser, his heirs or assigns.

In February, 1873, the Sioux City & St. Paul Railroad Company selected the tract in controversy with other lands as and for a part of the lands inuring to it under said act of Congress of May 12, 1864, and filed a written list of said selection with the register and receiver of the Land Office at Sioux City, Iowa. Said officers, in March, 1873, allowed and approved the filing of said list and certified the same as being within the 10-mile limits of said grant and as being free and clear of homestead, pre-emption, state, or other valid claims, which list was duly transmitted to the Commissioner of the General Land Office. The Commissioner of the General Land Office, in June, 1873, approved the said selection and transmitted to the Secretary of the Interior a list embracing said tract of land. In the same month the Secretary of the Interior approved said selection and certificate, and caused copies of such approved list to be filed with the register and receiver at Sioux City, Iowa, and with the Governor of Iowa, and in June, 1873, the United States issued to the state of Iowa, for the use and benefit of said Sioux City & St. Paul Railroad Company, a patent embracing the tract of land in controversy and other lands, as and for a part of the lands inuring to the state of Iowa, and said

Sioux City & St. Paul Railroad Company, under said act of Congress of May 12, 1864.

On or about the 21st day of May, 1887, one J. H. Pasco, then a citizen of the United States, purchased the land in controversy from the Sioux City & St. Paul Railroad Company, in consideration of certain payments made and to be made by said Pasco or assigns until the full sum of $2,146.50 should be paid, and thereupon said Pasco entered into the possession of said land and made valuable improvements thereon. On July 17, 1889, said Pasco sold and assigned said contract for the purchase of said lands to the defendant George W. Patterson, who immediately entered into the possession thereof and made lasting and valuable improvements thereon, and said Patterson and subsequent grantees have continued in the possession, occupation, and cultivation of said land continuously since said date. In the agreed statement of facts it is said that, at the time Pasco and Patterson made their purchases of said land, they each believed in good faith that the said land had been earned by the said railroad company; they knew that the land was within the 10-mile limits of said railroad constructed by the said Sioux City & St. Paul Railroad Company, but did not know that the railroad company had sold all the lands it had earned at the time of their said purchase, nor did they or either of them know that the railroad company had received indemnity lands by a patent from the state of Iowa of sufficient quantity, along with other lands that had been patented to said railroad by the state, to equal their entire earnings by reason of the construction of said railroad to Le Mars.

In October, 1889, the United States commenced an action in the Circuit Court for the Northern District of Iowa, against the Sioux City & St. Paul Railroad Company and others, to which action said Pasco and said Patterson were not parties, to quiet the title of the United States in and to certain lands, including those in controversy, for the reason that the same had not been earned by said Sioux City & St. Paul Railroad Company. Such proceedings were had that in October, 1890, said Circuit Court entered a judgment, quieting title to said lands in the United States, from which judgment an appeal was taken to the Supreme Court of the United States and said judgment affirmed on the 21st day of October, 1895. Thereafter, on November 18, 1895, the Commissioner of the General Land Office, with the approval of the Secretary of the Interior addressed a communication to the register and receiver at Des Moines, Iowa, reciting the fact of said suit, judgment, and affirmance by the Supreme Court and directed that, in order to carry the restoration to entry of said lands into effect, they should publish a notice for a period of 30 days that the lands, a description of which was to be included in the notice, would be restored to the public domain, and subject to entry on a day to be fixed by the notice, which should be 90 days from the date of the first publication, and that all persons claiming any part thereof under the act of March 3, 1887, should come forward within the 90 days immediately following the first publication and give notice of their claim by publishing their notice of intention to make proof

thereon upon a day which should be subsequent to that fixed for the restoration. Said communication contained the following sentence:

"To the end that complications which might arise from the former practice of suspending application for these lands may be avoided, and the rightful claimant to acquire title with as little delay as possible, I have to direct that, in the notice of restoration, there be inserted a notice to all prior applicants that their applications confer no rights upon them, and that upon the day set by you for the restoration the lands will be open to entry and disposal without- regard to said applications, which shall be held by the notice to be rejected; that all such applicants may also have opportunity to present new applications upon the expiration of the ninety days' notice, you will notice specially all parties shown by your records to have pending applications for these lands, of the rejection thereof, of the date of the restoration and of the necessity of presenting new applications for the protection of their rights. In all cases of conflicting claims, you will proceed in accordance with the rules of practice in contested cases."

Pursuant to said communication, the register and receiver of the United States Land Office fixed the 27th day of February, 1896, as the date prior to which applicants under the act of March, 1887, should file their applications, and as the date upon which persons claiming under the homestead laws of the United States should file their applications, which notice was duly published, etc. On October 22, 1895, the plaintiff, Lyle, settled upon the land in controversy, and in February, 1896, tendered to the register and receiver of the United States Land Office at Des Moines, Iowa, a homestead application with the necessary fees therefor to enter said land, which application and fees were refused by the register and receiver, and on March 24, 1896, defendant appeared before the Land Office at Des Moines, Iowa, and tendered his homestead filing for the land in controversy, alleging a settlement, residence and cultivation of said land, and the legal qualification to make said entry, and tendered the legal and proper fees and homestead filing therefor, which filing and tender of fees the officers held in abeyance, pending the trial and examination of all parties concerned therein. Pursuant to the notice aforesaid, the defendant Patterson, on January 13, 1896, filed with the register and receiver of the United States Land Office at Des Moines, Iowa, his written notice of intention to make proof of defendant's purchase of the land in controversy under the provisions of the act of March 3, 1887. The register and receiver of the Land Office fixed the 13th day of May, 1896, upon which proof should be submitted on behalf of the plaintiff and defendant herein and all others claiming any interest in said land, notice of which date of hearing was duly published in accordance with the requirements of the Department of the Interior. On May 13, 1896, plaintiff and defendant Patterson appeared, as well as other parties who had filed applications to enter the same as a homestead. At said hearing the parties made proof of their respective claims; and the register and receiver rendered their decision in writing that one Louis Hoffman was entitled to the land in controversy as a homestead. From the decision of the register and receiver, plaintiff and defendant Patterson each perfected appeals to the Commissioner of the General Land Office, and in August, 1899, the Commissioner of the General Land Office rendered a decision reversing that of the register and

receiver, and decided that one James A. Beacon was entitled to the lands under the homestead laws of the United States. From that decision the plaintiff and defendant Patterson each perfected appeals to the Secretary of the Interior. The Secretary reversed the decision of the Commissioner of the General Land Office and decided that the defendant Patterson was a bona fide purchaser of said land under and by virtue of his contract of purchase with the railroad company before mentioned, and that he was entitled to the land in question, under the act of March 3, 1887, as a good-faith purchaser. And thereafter a patent was duly issued from the United States, bearing date March 23, 1901, to the land in question to the defendant Patterson as a good-faith purchaser under said act of March, 1887. Subsequent to the decision of the Secretary of the Interior, to wit, January 30, 1901, Patterson conveyed said premises to T. H. Smith and W. H. Smith for a stated consideration of $6,360, and on March 31, 1901, and after the issue of the patent to Patterson, said T. H. Smith and W. H. Smith sold and conveyed the premises to defendant Thomas Beacom, in consideration of the sum of $6,600, and at the commencement of this suit the legal title was in the defendant Thomas Beacom. On May 24, 1901, plaintiff commenced this action in the Circuit Court of the United States for the Northern District of Iowa, setting forth in substance, but more in detail, the facts hereinbefore referred to, and praying that it be adjudged and decreed that the decision of the Secretary of the Interior, holding that defendant Patterson was entitled to said lands as a good-faith purchaser under the act of March 3, 1887, be set aside, canceled, and declared void, and that the defendant Beacom hold said land in trust for plaintiff, and for a conveyance from said Beacom to plaintiff. To this action the defendants appeared, issues were joined, proofs taken, and the Circuit Court entered a decree, dismissing complainant's bill, to reverse which decree complainant prosecutes this appeal.

Numerous questions have been presented and discussed by counsel, relative to the effect and interpretation of the respective acts of Congress, and of the General Assembly of the state of Iowa, and Patterson's rights as a purchaser from the railroad company; but in the view which we take of the case but two questions only will be considered. It clearly appears by the agreed statement of facts that Pasco, in his purchase from the railroad company, paid the then full value of the land; that he entered into possession, and he and the subsequent assignees and grantees have continued since such purchase in the actual occupation and possession of the premises, cultivating the same, made lasting improvements, and have paid taxes thereon since the year 1887; that at the time complainant entered upon said land with a view of making a homestead settlement he knew of the occupation and possession by the defendant Patterson, of his improvements thereon, and of his claim of ownership of said land.

If it be assumed for the sake of the argument that Patterson was not entitled to acquire this land under the congressional act of March 3, 1887, yet his possession was not mala fides. It was obtained and held under such a state of facts that no one but the United States could

question his right thereto. Under such circumstances, complainant's entry upon the lands was that of a mere trespasser, and as such he acquired no rights under the homestead laws.

In Atherton v. Fowler, 96 U. S. 513, 24 L. Ed. 732, the court said:

"Among the things which the law required of a pre-emptor, and the principal things required of him to secure his right, were: (1) To make a settlement on the land in person. (2) To inhabit and improve the same. (3) To erect a dwelling house thereon."

These things were also principal requirements of the homestead law. Harvey v. Holles (C. C.) 160 Fed. 531.

In Atherton v. Fowler, the court also said:

"It is not to be presumed that Congress intended in the remote regions where these settlements are made to invite forcible invasion of the premises of another in order to confer the gratuitous right of preference of purchase on the invaders. In the parts of the country where these pre-emptions are usually made, the protection of the law to rights of person and property is generally but imperfect under the best of circumstances. It cannot, therefore, be believed, without the strongest evidence, that Congress has extended a standing invitation to the strong, the daring, and the unscrupulous, to dispossess by force the weak and the timid from actual improvements on the public land, in order that the intentional trespasser may secure by these means the preferred right to buy the land of the government when it comes into market. * * * Does the policy of the pre-emption law authorize a stranger to thrust these men out of their houses, seize their improvements, and settle exactly where they were settled, and by these acts acquire the initiatory right of pre-emption? The generosity by which Congress gave the settler the right of pre-emption was not intended to give him the benefit of another man's labor, and authorize him to turn that man and his family out of their home. It did not propose to give its bounty to settlements obtained by violence at the expense of others. The right to make a settlement was to be exercised on unsettled land; to make improvements on unimproved land. To erect a dwelling house did not mean to seize some other man's dwelling. It had reference to vacant land, to unimproved land; and it would have shocked the moral sense of the men who passed these laws, if they had supposed that they had extended an invitation to the pioneer population to acquire inchoate rights to the public lands by trespass, by violence, by robbery, by acts leading to homicides, and other crimes of less moral turpitude."

That a party cannot initiate a right of homestead by settling upon land at the time in the actual possession of another, under a bona fide claim of right, is shown in the following cases: Hosmer v. Wallace, 97 U. S. 575, 24 L. Ed. 1130; Quinby v. Conlan, 104 U. S. 420, 26 L. Ed. 800; Trenouth v. San Francisco, 100 U. S. 251, 25 L. Ed. 626; Clipper Mining Co. v. Eli Mining Land Co., 194 U. S. 220–231, 24 Sup. Ct. 632, 48 L. Ed. 944.

To maintain this action and obtain a decree from a court of equity, awarding to him the title to the land in question, complainant must establish that he initiated such a right to the land, by settlement thereon, and offer to enter, as gave to him in equity a right to the land prior and paramount to the legal title of defendants. Campbell v. Weyerhaeuser, 161 Fed. 332, 88 C. C. A. 412. In this we think he has signally failed.

After the Land Department awarded the land to Patterson, complainant took no farther steps and made no farther claim to the land until the institution of this suit, and it appears from the agreed statement of facts that the defendant Beacom purchased the land for full

value, after a patent from the United States to defendant Patterson had issued, and without any knowledge of complainant's claim. Such being the case, his title is impregnable as against complainant. U. S. v. Detroit Lumber Co., 131 Fed. 668, 67 C. C. A. 1; Colorado Coal Co. v. U. S., 123 U. S. 307, 8 Sup. Ct. 131, 31 L. Ed. 182.

For these reasons alone, without considering other questions presented, we think the decree of the court below was right; and it is therefore affirmed.