# Higgins *v.* Board of Trustees of University of Alabama.

*Bill in Equity by Homestead Claimant, to compel Conveyance of Legal Title by Trustees of University Lands.*

1. *Homestead entry; right of claimant as against subsequent selection of lands for University of Alabama.*—A person who entered on a tract of land subject to entry as a homestead, cleared and cultivated a part of it, and erected improvements for a residence, intending to enter it as a homestead under the acts of Congress (U. S. Revised Statutes, §§ 2289-96), but did not make the preliminary affidavit, declaration or payment required in such cases, did not acquire such a right to the land as entitles him to demand a conveyance of the legal title by the trustees of the University of Alabama, in whom it has vested by the selection of the land by the agents of the State of Alabama, under the act of Congress "to increase the endowment of the university from the public lands in the State" (U. S. Stat. at large, vol. 23, p. 12), and the approval of that selection by the Secretary of the Interior at Washington.

APPEAL from the City Court of Birmingham, in equity.

Heard before the Hon. H. A. SHARPE.

The bill in this case was filed on the 23d January, 1890, by Elias M. Higgins against the "Board of trustees of the University of Alabama," and sought to devest the legal title to a tract of land out of the defendants, and vest it in the complainant by the decree of the court, or by a conveyance executed under its order. The tract of land contained 160 acres, and was held by the defendants as a part of the lands donated to the State of Alabama, for the benefit of the university, by the act of Congress approved April 23d, 1884; having been selected by the State's agents appointed for that purpose, and their selection having been approved by the Secretary of the Interior, May 19, 1885. The complainant's claim to the land was based on these allegations of his bill: (1.) "That some time in the Fall of 1881," being then a citizen of said State and county, "he built a dwelling-house on said land, and with his family moved into said house, and began clearing and improving said land, with the intention of entering the same

[Higgins v. Board of Trustees of University of Alabama.]

as a homestead, said land then being public land belonging to the United States." (2.) "That he has cleared and fenced twenty-five acres of said land, and has erected improve-ments," particularly described, "of the total value of $700." (3.) "That ever since the settlement of said land as above stated, he has cultivated the cleared portion in growing crops, cotton, corn, &c., and with his family has continuously re-sided upon, occupied, used and claimed all of said land as his homestead, and has had no other homestead, and has never sold or conveyed any part of said land, nor attempted to sell or convey the same ; and he is still residing upon said land, cultivating and claiming it as his homestead; and he has never, prior to said settlement, made, perfected or abandoned any homestead or pre-emption entry." The bill then stated the selection of the land by the State's agents, as part of the university lands, and the approval of their selection by the Secretary of the Interior; but alleged that complainant had no notice of any of these proceedings, and no opportunity to assert his rights ; that at the time of the selection, and long prior thereto, "he was in open possession and occupation of said land, residing thereon with his family, claiming the same as his homestead;" and claimed that his right of homestead had attached by his occupation, continuous residence, erection of improvements, &c., and that the selection of the land by the State's agents was illegal and unauthorized by the act of Congress donating lands for the use and benefit of the uni-versity; and he therefore prayed a divestiture of the legal title out of the defendants, and the establishment of his equitable rights by the decree of the court.

The act of Congress approved April 23d, 1884, under which defendants claimed the lands, is entitled "An act to in-crease the endowment of the University of Alabama from the public lands in said State," and contains five sections, in substance as follows : SEC. 1. *"Be it enacted,"* &c., "That 46,080 acres of public lands in Alabama are hereby granted to the State of Alabama, in addition to the lands reserved to said State by the acts approved April 20th, 1818, and March 2d, 1819, for the benefit of the University of Alabama, to be applied as far as may be necessary to the erection of suitable buildings for said university, and to the restoration of the library and scientific apparatus, heretofore destroyed by fire ; such application to be made in such manner as the legislature of said State may direct, or may empower the trustees of said university to direct." SEC. 2. "That the Governor of Ala-bama may appoint one or more agents to select the lands granted in this act, from any public lands within said State

[Higgins v. Board of Trustees of University of Alabama.]

not included in some subsisting grant made by the United States; and such agents shall make report of such selections to the Commissioner of the Public Land Office, to be approved by the Secretary of the Interior." SEC. 3. "That the provisions of this act shall not apply to any legal subdivision of land to which the right of homestead entry or pre-emption shall have attached, in favor of any person who is entitled to such homestead and pre-emption entries, and who is occcupying and claiming such subdivision of the public lands in Alabama at the time when such selections are approved by the Secretary of the Interior; and in cases where it is found that such claims are superior to the rights of the State of Alabama herein granted, the said State may select other lands in lieu thereof, and in like quantity, elsewhere in the said State, from the public lands of the United States, so as to make up as nearly as may be the total number of acres of land granted in this act to said State." SEC. 4. "That when the selection of said lands is so made, and approved by the Secretary of the Interior, the title to the same shall vest in the State of Alabama, to and for the use and benefit of the University of Alabama, to be applied, first, to the uses and purposes declared in the first section of this act, and then to the endowment of said university, and to no other purposes whatever; and patents shall issue to the said State, for the lands so selected and approved. And the State of Alabama shall by law direct the sale of such lands, and the money arising from such sales shall be paid into the treasury of the State of Alabama; but no expenses that may be incurred in making such sales, after the selections of lands made under this act are confirmed by the Secretary of the Interior, and are entered on the township maps of the proper land-office, shall be paid by the United States." SEC. 5. "That the Secretary of the Interior is empowered to make all needful and proper regulations and rules for carrying this act into effect, and for the decision of all questions that may arise as to the right of the State of Alabama to any lands that may be claimed under the provisions of this act."—U. S. Statutes at large, vol. 23, p. 12.

The statutory provisions regulating homestead entries may be found in U. S. Revised Statutes (1878), §§ 2289–96.

The court below dismissed the bill, on demurrer, for want of equity, and its decree is here assigned as error.

BROWN & CREWS, for appellant.—(1.) The homestead law is a contract made by the Government with every settler upon public lands who complies with the law: the contract is, that if any citizen over twenty-one years of age, or the head of a

[Iliggius v. Board of Trustees of University of Alabama.]

family, will settle upon and improve a tract of public land subject to entry, not exceeding one hundred and sixty acres, and reside upon and cultivate the same for a period of five years, the Government will give him a patent for the land. By compliance with the law, the settler acquires a vested right to the land as against the Government and all the world besides, except as against another purchaser or settler. As to a second purchaser or settler, the first settler can only acquire a right by applying to enter the land within ninety days after settlement. The reason no vested right is acquired as against a second purchaser or settler, except by entry at the Land-Office, is because this is one of the provisions of the law under which the right is acquired.—U. S. Rev. Statutes, §§ 2289–91; 21 U. S. Stat. at large, 140; *Pac. Railroad Co. v. Roberts,* 10 U. S. Land Decisions, 427; *Cooper v. Roberts,* 18 How. 173.

The settlement upon this land by the complainant was the inception of his right, and the continuation of such settlement, residence and cultivation segregated the land from the public lands of the United States, and was full and complete notice to all the world of his rights in and to it.—*Ex parte Newman,* 8 U. S. Land Decisions, 448; *Ex parte Howard,* Ib. 228; *Wilcox v. Jackson,* 13 Peters, 498; *Railroad Co. v. Roberts,* 10 U. S. Land Decisions, 427; *Railroad Co. v. Bass,* Ib. 499; *Railroad Co. v. United States,* 92 U. S. 733. Having settled on the land, cultivated and improved it, and resided on it for five years, complainant is entitled to enter it, and on proof of such settlement, improvement, cultivation and residence, entitled to a patent.—21 U. S. Statutes, 140; 8 U. S. Land Decisions, 448.

Even if a homestead were a pure grant from the United States, and not a contract, yet, complainant having accepted it, and signified his acceptance by settlement, improvement, cultivation and residence, the Government has no power to vacate or cancel it. while complainant remains in possession, complying with the law under which the grant was made. *Minter v. Crommelin,* 18 How. 173: *Town of Pawlett v. Clark,* 9 Cranch, 392.

(2.) The claim of defendants, being under a pure grant, and without consideration, must be strictly construed. There are no intendments or presumptions in favor of a grant. Nothing passes or is conveyed by a grant except that which is expressly and clearly stated.—*United States v. Arredondo,* 6 Peters, 738; *Charles River Bridge v. Warren Bridge,* 11 Peters, 420; *Dubuque & Pacific R. R. Co. v. Litchfield,* 23 Howard, 66; *Rice v. Minnesota & North Western R. R. Co.,* 1 Black, 380; *Leavenworth R. R. Co. v. United States,*

[Higgins v. Board of Trustees of University of Alabama.]

92 U. S. 740; *Rice v. Sioux City & St. Paul R. R. Co.,* 110 U. S. 698; *Sidell v. Grandjean,* 111 U. S. 437; *Leavenworth, Lawrence & Gal. R. R. Co. v. U. S.,* 92 U. S. 733.

Defendants have no claim to the land as a purchaser or settler, on account of the failure of complainant to enter at the land-office in ninety days. The words used in the act of May 14, 1880, did not and could not mean the donees of some subsequent grant Congress might make, but a "purchaser" or "settler" under the homestead and pre-emption laws then in force. Congress might have done it, but did not provide in the homestead law a forfeiture of the settler's right for failure to enter within the time required. The right complainant acquired under the act, and the homestead law generally, was good as against all the world except another "purchaser or settler." Congress could not by subsequent law abridge or take away any rights acquired by a compliance with the law in force at the inception of his right by settlement.—*Railroad Co. v. Roberts,* 10 U. S. Land Decisions, 427; *Victorien v. Railway Co.,* 10 *Ib.* 637; *Railroad Co. v. United States,* 92 U. S. 733; *United States v. Arrendondo,* 6 Peters, 738; *New Orleans v. Armas,* 9 Peters, 224.

The power of the Government to dispose of the public domain is in Congress. The Secretary of the Interior has no inherent powers, but can only perform such acts as he is by law authorized to do. He has no power to dispose of the public lands, except as conferred on him by Congress; and his acts in excess of his authority are void.—*United States v. Fitzgerald,* 15 Peters, 407; *Gibson v. Choteau,* 13 Wallace, 92; *Smelting Co. v. Kemp,* 104 U. S. 646; *Morton v. Nebraska,* 21 Wallace, 660; *Stone v. United States,* 2 Wallace, 525; *Stephens v. Westwood,* 20 Ala. 275; *Bates v. Herron,* 35 Ala. 117; *Crommelin v. Minter,* 9 Ala. 594.

Congress had no power to grant away the complainant's land, and could not confer such a power on the Secretary of the Interior, or any other officer. An express reservation of the complainant's rights was not necessary in the act donating land to the University of Alabama. If the donation had been of so many acres of the public lands in Alabama, without qualification or reservation, his land would not have so passed under the grant, (1) because it was already segregated from the public lands by his settlement, cultivation, &c.; (2) because he had acquired such a vested right as could not be taken away by any subsequent act of Congress; and (3) because the presumption is that Congress would not attempt to commit such an act of injustice.—*Railroad Co. v. Roberts,* 10 U. S. Land Decisions, 427; *Rector v. Gibbons,*

[Higgins v. Board of Trustees of University of Alabama.]

111 U. S. 284; *Minnesota v. Bachelder*, 1 Wallace, 109; *United States v. Fitzgerald*, 15 Peters, 407; 113 U. S. 629; 1 U. S. Land Decisions, 336; 10 *Ib.* 181; *Ib.* 637. It is the policy of the Government to protect settlers upon the public lands. Even if it had the power to do so, it would be an outrage on the rights of citizens to invite settlers upon the public lands by promise of a homestead, and grant their homes to others while occupied by them.—91 U. S. 337; 111 U. S. 284; 113 U. S. 629; 24 Howard, 394; 8 U. S. Land Decisions, 288.

But Congress did not attempt nor intend to grant away the land of complainant, or other lands similarly situated. The grant of lands for the benefit of the university is of "public lands in the State of Alabama not included in some subsisting grant;" and this necessarily excludes lands to which homestead rights had already attached. Moreover, the third section of the donating act expressly declares that "the provisions of this act shall not apply to any legal subdivisions of land to which the right of homestead or pre-emption shall have attached in favor of any person who is entitled to such homestead and pre-emption entries, and who is occupying and claiming such subdivisions of land at the time when such selections are approved by the Secretary of the Interior;" and it was further provided that, it cases where such prior rights were found to be superior to the rights of the State of Alabama to any lands selected under the donating act of Congress, the State might select other lands in lieu thereof. These provisions show how clearly Congress guarded and intended to protect the rights of innocent settlers—not only rights which had become perfected, and which required no protection, but inchoate rights which had "attached." The act of Congress gave notice to the State's agents that there were probably homestead claimants on some of the lands which they might select, and charged them with the duty of ascertaining and avoiding the lands so occupied and claimed; yet they selected the land which the complainant was thus occupying and claiming, and their selection was approved by the Secretary of the Interior, without notice to him, and without giving him an opportunity to be heard.

(3.) If the foregoing legal propositions are correct, the selection of the complainant's land by the State's agents, and the approval of their selection by the Secretary of the Interior, were acts *ultra vires*, totally void, and binding on no one. Their validity may be questioned in any court, and in any proceeding; and a court of equity will grant the appropriate relief in this case.—*Elliot v. Piersol*, 1 Peters, 340;

[Higgins v. Board of Trustees of University of Alabama.]

*Wilcox v. Jackson*, 13 Peters, 269; *Smelting Co. v. Kemp*, 104 U. S. 646; *Sherman v. Buick*, 93 U. S. 209; 6 Wall. 160; 18 Wall. 112; *Polk v. Wendell*, 9 Cranch, 87; *United States v. Stone*, 2 Wall. 525; *Patterson v. Winn*, 11 Wheat. 380; *Stoddard v. Chambers*, 2 How. 284; *Morton v. Nebraska*, 21 Wall. 660; *Minter v. Crommelin*, 18 How. 72; *Johnson v. Towsley*, 13 Wall. 72; *Moore v. Robbins*, 96 U. S. 535; *Stark v. Starrs*, 6 Wall. 402; *Shepley v. Cowan*, 91 U. S. 340; *Lindsay v. Hawes*, 2 Black, 554; *Garland v. Wynn*, 20 How. 243; *Lyttle v. Arkansas*, 9 Wall. 328; *Cunningham v. Ashley*, 14 Wall. 377; *Rector v. Gibbons*, 111 U. S. 276.

A. C. HARGROVE, *contra.*—1. The facts stated in the bill do not show that the complainant is entitled to the relief which he seeks. In the first place, he does not state that the land was subject to entry as a homestead when he entered on it; and as matter of fact, being mineral land, it was not subject to entry as a homestead, and he was a mere trespasser. *Hosmer v. Wallace*, 97 U. S. 575. No vested right can be acquired by a homestead settler in land which was not open to entry at the time, nor afterwards unless he obtained his patent before the title passed out of the United States. 9 Wallace, 187; 15 Wallace, 77; 15 Peters, 407; 9 Cranch, 99; 18 Howard, 88; 78 Ala. 88; 82 Ala. 540. That a patent to land which has been reserved from entry or sale is void, see 12 Peters, 499; 13 Wall. 92; 6 Wall. 160; 21 Wall. 673; 18 Wall. 112.

2. If the land was subject to entry as a homestead, the complainant does not show that he ever complied with the provisions of the law regulating such entries, and no right of homestead ever attached in his favor.—*Frisbie v. Whitney*, 9 Wall. 187; *United States v. Fitzgerald*, 15 Peters, 407; 15 Wall. 77; 130 U. S. 232; *Witherspoon v. Duncan*, 4 Wall. 210; 119 U. S. 330; 132 U. S. 357.

3. When the State's agents selected the land, it was not subject to entry as a homestead, nor otherwise exempt from selection; their selection was regular, and it was approved by the Secretary of the Interior at Washington. This was conclusive of the right and regularity of the selection, certainly in the absence of fraud and mistake.—3 U. S. Land Decisions, 315.

4. If the complainant could now obtain a decree vesting in him the legal title to this land, he would take it discharged of the conditions annexed to homestead entries, and the University could select no other land in lieu of it.

McCLELLAN, J.—We will concede, for the purpose of this appeal, that the complainant (appellant here) had made entry on the land in controversy as a homesteader, prior to the approval of its selection by agents of the State of Alabama under the act of Congress of April 24, 1884, "to increase the endowment of the University of Alabama from the public lands in said State;" and that he had cleared and put improvements on it prior to, and was cultivating and occupying it as a home at the time of the approval of such selection by the Secretary of the Interior, on May 19, 1885. It is not clear from the averments of the bill that the land was subject to homestead entry; but, pretermitting a discussion of that point, the further concession will be made that the land was subject to such entry. There is no pretense advanced by the bill that complainant did aught else at any time toward perfecting a homestead entry than to enter upon, improve, clear, live on and cultivate the land with the intention of making it his homestead. No declaration was ever made or filed. No payments, required by the statutes of the United States to perfect entry and entitle the entry-man to a patent, have ever been made. Occupation for the length of time, and cultivation and improvements of the character required by the homestead laws, are the facts, linked to an intention to make the premises his home, and the sole facts upon which the demand advanced by complainant's bill is made to rest. That demand is, that the legal title to the land, which has vested in the trustees of the University of Alabama, by approval and certification by the Secretary of the Interior of the list containing this among many other parcels to the State of Alabama, and by an act of the legislature of Alabama, shall be divested out of said trustees, and vested in the complainant. This title is of the absolute fee, without limitations or restrictions upon the uses to which the grantees may devote the land, or upon their power of disposition, or with respect to the charges that may be made upon it by them, or which the law may impose by way of enforcing liabilities incurred by them, further than is implied in the general purposes of the grant to provide suitable buildings and appliances and an endowment fund for the University of Alabama. This title, if passed into the complainant as prayed in his bill, would, of course, be of the absolute fee, discharged not only of the trusts with which it is charged in the hands of its present holders, but also free from all limitations of the homestead laws of the United States. The land, for instance, would be chargeable for indebtedness of the complainant contracted prior to the vesting of the title in him, which is specially provided against in respect of home-

steads (Rev: Stat., § 2296). In other words, the effectuation of the prayer of complainant's bill involves, not his investiture of a homestead title, but of an ordinary title in fee simple to the land in question; and he would become not the homestead owner only, but the owner without restriction of eighty acres of land, which might be taken from him immediately by the enforcement of an antecedent liability. Not only would he thus acquire an estate to which he was not entitled from the Government on the facts upon which his claim is rested, and which, in contravention of the policy of Federal legislation respecting homesteads, might at once be taken away from him, but that estate would be acquired without the performance by him of the conditions precedent upon which his rights under homestead laws are made to depend.

It is just as essential to the issuance of a patent to a homestead, or to the perfect right to demand a patent, that the affidavit required by Revised Statutes, § 2290, should at some time be made, and that the sum of money prescribed by that section should be paid, as that the would-be entry-man should comply with statutory requirements as to occupation, cultivation and the like. Conceding that, under the act of May 14, 1880 (21 Stat. at Large, 140), an entry may be initiated by settlement alone, and that the declaratory affidavit above referred to need not be made *in limine*, it by no means follows that the necessity for such affidavit is obviated. On the contrary, we are clear to the conclusion, that the 'sworn declaration must in all cases be filed before the inchoate entry can ripen into such right as draws to it title, or the right to demand the issuance of a patent. And so with the money necessary to perfect a homestead entry. Whether the entry be initiated by formal filings and possession taken, or only by settlement, the fees must be paid before it can be perfected, and before a patent can be issued or demanded. As we have seen, no declaration has ever been made, or fees paid by the complainant. He can not now file such affidavit and make such payment. To do so would not entitle him to a patent from the United States, because the government has no title to the land. The defendants' attitude and rights respecting the property manifestly could not be affected by any declaration or payments made to them, such as the statute requires to be made to government officials. The time for these things to be done by the complainant, if there has been any such time, has forever passed. No offer to do them is, or could with propriety have been, embodied in the bill. Yet the complainant, without having complied with these conditions precedent to the right to demand a patent for a homestead estate in the land—with-

out having put himself in a position to require a conveyance
of such estate from the United States; having, in short, no
right to the relief prayed as against the grantor of the de-
fendants—would, if the theory of his bill be a sound one, not
only effectuate a non-existing and never-existing right as be-
tween him and the United States against the latter's grantees,
but in doing so would acquire a larger estate in the land than
he would have been entitled to had he fully complied with all
the requirements of the homestead laws. A theory upon
which such results may be worked out can not be tolerated.
The true doctrine is, that until the complainant had complied
with all the statutory requisitions—had filed his declaration,
and paid the sum of money required, as well as occupied, cul-
tivated and improved the land, as provided in the statute.—he
had no vested rights in the premises, no rights which might
not be cut off and defeated by a grant by the United States
to a third party, and hence no right which, at least in the ab-
sence of fraud or gross mistake, he could assert against such
third party,

This appears to be the understanding of Congress in all
cases like the present one. Statutes like that involved here
uniformly, it is believed, contain a saving clause for the pro-
tection of settlers, or homesteaders, whose entries are inchoate.
The necessity for such clause is uniformly recognized, and this
recognition must be rested on the consideration that such in-
choate entries vest no estate or interest in the entry-man,
since, if he had vested rights, they would be saved to him
under organic guarantees in the absence of any such provision
in the statute. And in all reason it must be the law, that
mere settlers on the public domain, with whatever intention,
and to what extent soever they cultivate and improve the
land, acquire no vested rights in the premises, no rights which
can be supported against a grantee of the Government. It is
an anomaly too flagrant to receive the sanction of any court,
that the United States, against which statutes of limitations
do not run, and as to which the doctrines of adverse possession
and *laches* have no application, should be deprived of the title
to land by the mere possession and use of it by others, unac-
companied by those further acts on the part of the settler
which the statute prescribes as conditions precedent to the
vesting of his rights, and which are intended to advise the
officials charged in that regard of the claim desired to be
effectuated. If this could be done, no grant of public lands
could ever be made until the government had made in-
quisition in respect of every legal subdivision, and ascer-
tained that no settlement had been made upon it; and, if the

[Higgins v. Board of Trustees of University of Alabama.]

position of complainant be correct, whenever such inquiry disclosed settlement, no grant could ever be made, and this notwithstanding the settler might never comply with the statutes as to payments, declaratory affidavits, and proof of occupation and cultivation. That this is not the law is clear, we think, logically and upon authority.—*Newkirk v. Marshall*, 35 Kan. 77; *Thrift v. Delaney.* 69 Cal. 188; *Frisbie v. Whitney*, 9 Wall. 187, 189.

It is very true, that the policy of the General Government towards persons who have settled upon and reclaimed public land, ought to be, and is a liberal one. Congress has always been careful to conserve their welfare, and to secure to them the fruits of their labor by which such land is made productive. But no vested rights adverse to the United States being involved, it lies in the unfettered election of Congress to say to what extent such conservation is to be carried, and to prescribe the terms, conditions and methods under which it is to be effectuated. Pursuing that broad and liberal policy which has always obtained in these matters, Congress has provided, in the third and fifth sections of the act granting lands to Alabama for the State University, the manner in which land selected by the State, upon which settlements have been made, may be reserved out of the grant, and saved to settlers. Section 3 is as follows: "That the provisions of this act shall not apply to any legal subdivision of land to which the right of homestead entry or pre-emption shall have attached in favor of any person who is entitled to such homestead and pre-emption entries, and who is occupying and claiming such subdivision of the public lands in Alabama at the time when such selections are approved by the Secretary of the Interior. And in cases where it is found that such claims are superior to the rights of the State of Alabama herein granted, the said State may select other lands in lieu thereof, and in like quantity, elsewhere in said State, from the public land of the United States, so as to make up, as nearly as may be, the total number of acres of land granted in this act to said State." Section 5 provides: "That the Secretary of the Interior is empowered to make all needful and proper regulations and rules for carrying this act into effect, and for the decision of all questions that may arise as to the right of the State of Alabama to any lands that may be claimed under the provisions of this act." And by section 4 of the act it is provided: "That when the selections of said lands are so made [*i. e.*, by the agents of the State whose duty it is to report lists of selections to the Commissioner of the General Land Office,] and are approved by the Secretary

[Higgins v. Board of Trustees of University of Alabama.]

of the Interior, the title to the same shall vest in the State of Alabama," for the benefit of the university, as prescribed in the act.

These provisions came before Acting Secretary of the Interior Joslyn, in January, 1885, for consideration and interpretation in respect of the rights of settlers upon lands so selected and the time and manner of their assertion. The precise question involved was, whether the rights of one claiming entry initiated by occupation only were foreclosed and forever barred by the approval of the selection of the particular subdivisions by the Secretary; and the conclusion reached was, that the statute contemplated and provided for a contest of the selection only before such approval; that the *onus* of instituting and prosecuting the contest was upon the settler; that if no contest was instituted in a given instance prior to the Secretary's final action on the selection, "the selection took the land," and it was his duty to approve the same; and that thereby the absolute title, freed from the unpropounded claims of the settler, at once vested in the State of Alabama. The Secretary, referring in his opinion to section 3 above set out, said: "I construe this to mean, that the selection is entitled to be admitted and reported, subject to the inchoate claim which has been or may be filed within the time required by law, although subsequently to the date of selection; and that if such claim is not perfected, or prosecuted in good faith by the observance of legal requirements, up to the date of approval of the selection, the latter will prevail and take the land. For the act goes on to provide that, 'in cases where it is found that such claims are superior to the rights of the State of Alabama herein granted, the said State may select other lands in lieu thereof, and in like quantity,' &c., &c. This provision evidently contemplates an adjudication of the claim of the settler upon *selected* lands, and an award as to superiority; with the privilege to the State, if the issue be against her right, to select. *lieu* lands to make up the quantity so stricken from her lists. Now, a *lieu* selection is not made because of original refusal to admit to record, but in place of one admitted and afterwards stricken therefrom. If this be so, it is evident that the *onus* is upon the settler to prefer his claim, show his compliance, and receive his award, at least in so far as to give legal notice of its existence by proper filing, without requiring [as had been done by the Commissioner of the General Land Office, whose action in that behalf was being revised by the Secretary] advertisement of the lists, or preliminary affidavit as to non-settlement upon the lands as matter of fact."

[Higgins v. Board of Trustees of University of Alabama.]

We are not aware that this construction of the statute by the department charged with its execution has ever been departed from. Many decisions of the Interior Department have been referred to in argument, and cited on the briefs of counsel; but they involve only the rights of the settler as against the United States, in the absence of a grant by the Government to a third party, and hence in the absence of an adverse claimant. Such was the case of *Newman*, 8 Land. Dec. 448. We have in the outset of this opinion conceded the proposition advanced by this case, the gist of which, when applied to the relations existing between the complainant and the Government, is, that if the title to the land in controversy were still in the United States, he would be entitled, by complying with the homestead laws in respect of filing the declaratory affidavit, making payment, and proving settlement, &c., to have a patent issued to him. But that is not to say that he may do these things after the land has been granted to another, and have a patent from the Government; or that, without doing these things, he may now have the grantees of the Government convey the land to him. On the contrary, one of the factors in the conclusion reached in the *Newman Case* was the fact that no adverse claim to the land existed. Even if decisions of the Interior Department had been made at variance with the construction put on this act by Acting Secretary Joslyn, we would feel in no degree constrained to follow them. We regard that construction as eminently sound. The approval of selections by the Secretary of the Interior is from the clear intendment of the statute a judicial act. Congress, having plenary power in the premises, has said to the settler that his moral right is recognized; that he should have an opportunity to bring forward his claim; that he was entitled to his day in court, so to speak, and that if he fail to avail himself of the opportunity thus afforded, as a matter of favor and grace, to propound his claim and have the court, the Secretary of the Interior, to adjudge whether he is within the saving clause of the statute, it shall in effect be adjudged that he is not, and that "the selection" and not he "takes the land." This is the meaning of the act construed by the Acting Secretary, and as we construe it. The result reached by this construction—the vesting of title in the Sate notwithstanding a settlement, if the settler fail to contest the State's selection before approval—is not only supported by the terms of section 3 of the act, but is further reinforced by the explicit provision of section 4, that the approval vests the title in the State. The title referred to is the unincumbered fee in the United States, against which the settler has no

vested rights, as we have seen, but only the right given him as a matter of grace by this statute to defeat the State's selection, by seasonably propounding his claim before the officer who is required to approve the selection.

As was pointed out in the opinion of the judge of the City Court, some very anomalous consequences would ensue from a construction which would admit of the approval of the Secretary of the Interior being contested and defeated. In the first place, such approval is the end of the law; it is the final act by which title passes into the State, and by which the purpose of Congress is completely effectuated. That done, the State is invested with title to 46,080 acres of land, the quantity granted by the act, and every term of the act is filled. Thereafter no authority exists in the State to make other selections, and none in the Secretary of the Interior to approve other selections if made. To allow settlers, who have failed to assert their claim upon the seasonable opportunity afforded them by the act prior to approval, to bring them forward and have them effectuated subsequently thereto, would be to reduce the grant made by the State to that extent. It was stated in argument, that there are many settlers on lands selected and approved whose claims are identical with complainant's, and who are awaiting the decision of this case. If the position of complainant be correct, the State would get very much less than the 46,080 acres granted by Congress, since there is no authority in the act for the selection of *lieu* lands to make up for land thus taken from the State. Such a construction violates the letter and spirit of the statute, and can not be tolerated. Another anomalous result is well stated by the city judge. He says: "After the title has so passed [by the approval of selection], and in a suit to which the United States is not a party, it could not be bound by the decree of any court, so as to require, or even to authorize, its officers to approve other selections in lieu of lands divested out of the State by such decree. Otherwise, it would be within the power of the State's agents to select other lands in the same condition, and the settler may go into a court and by its decree clothe himself with the title; and like proceedings could be continued, until every such settler in the State has been invested with the title to the land occupied by him, without any further compliance with the laws and regulations of the United States;" and this process might be continued *ad infinitum*, or until the public domain of the State had been exhausted and passed into individual proprietorship, without any semblance of compliance on the part of the individual with provisions of the homestead laws which are essential

[Smith v. Collins & Griffith.]

.conditions precedent to the acquisition of any estate under them. These considerations serve to illustrate the absurd possibilities of the construction contended for by the appellant, and to demonstrate the soundness of the contrary view, which we have elaborated. Adopting that view, we hold that whatever right or claim the complainant had, conceding that he had any, was cut off by the judicial ascertainment of the Secretary of the Interior, evidenced by his approval of the selections, that the land in question was subject to the selection of the State; that the State took an absolute title in fee, unincumbered and unaffected by the fact of complainant's prior settlement on the land, and that this title having passed to the defendants, the trustees of the University of Alabama, they are beneficially, as well as nominally, the owners of the property, against the complainant and all the world.

The decree of the City Court dismissing the bill is accordingly affirmed.