## FRISBIE *v.* WHITNEY.

1. Occupation and improvement on the public lands with a view to preemption, do not confer a vested right in the land so occupied.
2. It does confer a preference over others in the purchase of such land by the *bonâ fide* settler, which will enable him to protect his possession against other individuals, and which the land officers are bound to respect.
3. This inchoate right may be protected by the courts against the claims of other persons who have not an equal or superior right, but it is not valid against the United States.
4. The power of Congress over the public lands, as conferred by the Constitution, can only be restrained by the courts, in cases where the land has ceased to be government property by reason of a right vested in some person or corporation.
5. Such a vested right, under the pre-emption laws, is only obtained when the purchase-money has been paid, and the receipt of the proper land officer given to the purchaser.
6. Until this is done, it is within the legal and constitutional competency of Congress to withdraw the land from entry or sale, though this may defeat the imperfect right of the settler.

APPEAL from the Supreme Court of the District of Columbia; the case being thus:

In March, 1862, and for many years before, there was a

large body of land in California known as the Soscol Ranch, and which was supposed by almost every one in that country to be private property. The tract covered eighteen square leagues, and included the city of Benicia, the town of Vallejo, the navy-yard of the United States, the depot of the Pacific Steamship Company, and hundreds of acres of land in cultivation and in possession of a large rural population. These parties all claimed under grants to a certain Vallejo by the Mexican government, made in 1843 and 1844, which had been presented to the Board of Land Commissioners and confirmed, and the decision of the board had been also affirmed on appeal to the District Court.

In March, 1862, the case coming before this tribunal, the court felt itself compelled to declare the grant void for want of authority in the Mexican government to make it, and on the 22d day of the month just named did so declare it; the decision not in any way impeaching the good faith of the numerous purchasers under Vallejo. However, as the act of Congress* which organized the Board of Commissioners to determine the land titles in California, declared that when any of the claims presented to it should finally be decided to be invalid the land should be considered as a part of the public domain, the effect of the decision was, that the United States became the absolute owner in fee of all the property, as above described; city, town, depot, ranch, the houses, the homes, the cultivated grounds and orchards, which the persons had bought and paid for, had built on and cultivated. The occupants had nothing left, of course, but an appeal to the equity and generosity of the government.

As soon as it became generally known in Benicia, and among the population on and about the Soscol Ranch, that this court had declared the Vallejo claim void, and that the whole eighteen leagues were public land, a rush was made to secure all of it that was valuable, and which it was supposed had become subject to the pre-emption laws. The report of the register and receiver of the Land Office, who were subsequently required to investigate the claims set up

---

* Act of 3d March, 1851, § 13.

to these lands, both by the Vallejo claimants and the settlers, presents the mode in which this was done. The parties desiring to make pre-emption claims generally went on the lands in the night, because they were resisted by those in possession; and in the morning a house, eight or ten feet square, with shed roof of redwood boards, set up edgewise, without window, fireplace, or floor, was discovered, the evidence of a *bonâ fide* settlement and occupation under the pre-emption laws of the United States.

Among the persons who sought to obtain a property by pre-emption right in this land was one Whitney, who, according to his own account, entered on a quarter-section one afternoon, with his family, consisting of his wife, two children, a man, and a carpenter, with his team, goods, and household furniture. He commenced building next day, and made a better house than those above described. It had three rooms. The quarter-section on which he entered had been already occupied by one Frisbie, a son-in-law of Vallejo, and one of the numerous persons in possession under Vallejo's title. It was inclosed by a fence, had a crop not yet gathered, and a house occupied by a tenant of Frisbie. Whitney's occupation was resisted by Frisbie, who on one occasion seized a double-barrelled shot-gun of Whitney's, cocked it at him, and stood in a menacing attitude, Whitney twisting it out of his hands.

On the 3d March, 1863, after the effect of the decision in *United States* v. *Vallejo* became known, and after Congress had had time to examine into the case, that body passed an act for the benefit of these occupants of the Vallejo claim.* This act authorized the lines of the public surveys to be extended over the Soscol Ranch, and enacted that *bonâ fide* purchasers from Vallejo or his assigns might enter the lands so purchased and reduced to possession at the time of the adjudication of the Supreme Court, at one dollar and twenty-five cents per acre. Under this act Frisbie paid his money, made his entry, and finally received his patent.

---

* 12 Stat. at Large, 808.

When, on the other hand, shortly after his settlement above described, Whitney applied to the land officers to make his declaration of intention to occupy and cultivate the land, they refused to receive it; first, because no surveys had been made by which the land could be identified, and afterwards because Congress had passed the act already cited for the benefit of the claimants under Vallejo. He never paid any money to the government, nor did he receive a certificate of entry or pre-emption, though he offered to prove his settlement.

In this state of things Whitney filed a bill in the court below, setting forth such of the preceding facts as bore favorably on his case, setting forth also that Vallejo's title had been declared void by this court on the 24th March, 1862, and that the land had so become part of the public domain, and subject to the right of pre-emption, and that he had settled upon it, erecting a dwelling-house, which he occupied with his family, cultivating, &c.; that the act of the 3d of March, 1863, had been passed at the solicitation of Vallejo, and purchasers under him. The bill proceeded:

"But your orator insists that after the decision of the Supreme Court of the United States in March, 1862, and before the passage of the special act of March 3d, 1863, above mentioned, the said lands were by law open to pre-emption; and your orator having within that period made a *bonâ fide* settlement, and having fully complied with all the conditions prescribed by law, is vested with the right to enter said lands."

It, therefore, prayed that as he, Whitney, had the superior equity, Frisbie should be compelled to convey the land to him.

Frisbie answered setting forth such of the already stated facts as affected favorably his case, denying the sufficiency of the settlement set up, admitting the decision of the Supreme Court, asserting that "the effect of that decision upon the rights of the purchasers under that grant, who had by themselves and their tenants settled and improved the land, was a question of law;" but maintaining "that it

did not subject the said land to settlement and pre-emption by strangers."

There was no great controversy apparently about the facts, and the court below, citing and relying on *United States* v. *Fitzgerald*,* *Smith* v. *United States*,† *Delassus* v. *United States*,‡ and *Lytle* v. *The State of Arkansas*,§ was of the opinion "that at the date of the complainant's entry on the land in controversy, in October, 1862, it was open to actual settlement and pre-emption; that he having made his actual settlement and improvement on the land, and complied with all the terms and conditions required by law to complete his title, or tendered performance thereof, was entitled to have a patent for the land, and obtained such an interest and vested title and property therein as could not be taken from him and transferred to another, against his consent, even by an act of Congress." It accordingly held Frisbie a trustee for Whitney, and decreed the conveyance prayed for.

The case was now brought here on appeal by Frisbie.

*Messrs. Evarts, Blair, and Dick, for the appellant; Messrs. B. F. Butler and F. P. Stanton, contra.*

Mr. Justice MILLER, after stating the case, delivered the opinion of the court.

Frisbie having become possessor of the legal title to the land in controversy, the complainant, Whitney, claims that he shall be compelled to convey it to him, because he has the superior equity; for this is a suit in a court of equity, founded on its special jurisdiction in matters of trust. It is, therefore, essential to inquire into the foundation of this supposed equity.

When, shortly after his settlement, Whitney applied to the land officers to make his declaration of intention to occupy and cultivate the land, they refused to receive it; first, because no surveys had been made by which the land could be identified, and afterwards because Congress had passed

---

* 15 Peters, 407.     † 10 Id. 330.     ‡ 9 Id. 133.     § 10 Howard, 333.

the act already cited for the benefit of the claimants under Vallejo. He never paid any money to the government, never received a certificate of entry or pre-emption, though he offered to prove up his settlement; and he claims that his intrusion on Frisbie's inclosed grounds by violence, and his offer to prove his intention to become a *bonâ fide* occupant of the land, create an equity superior to Frisbie's, which demands of a court of chancery to divest Frisbie of his legal title and vest it in him.

If there be any principle of law which requires this, the court must be governed by it, but it is idle to pretend that such a decree would be founded in natural justice.

It is claimed on the part of the defendant in error that such a principle is found in the legislation of Congress granting the right of pre-emption to actual settlers on the public lands of the United States. The proposition is, that as soon as the decree of the Supreme Court was announced declaring the Vallejo claim invalid, the land covered by that claim became public land, subject to the operation of all the laws by which the actual settler could secure title to such lands; and that the steps taken by Whitney in this direction had so far effected this purpose, that the act of Congress for the benefit of the Vallejo claimants was ineffectual to enable Frisbie to avail himself of the benefits which it was intended to confer. We say the benefits it designed to confer, because we entertain no doubt of the *intention* of Congress to secure to persons situated as Frisbie was, the title to their lands, on compliance with the terms of the act, and if this has not been done it is solely because Congress had no power to enact the law in question.

The learned court whose decision we are reviewing place their judgment on the ground that, before the passage of that act, the complainant had acquired a vested right in the land, which could not be divested by any legislation of Congress. On the other hand it will hardly be contended that anything short of a vested right in this land could deprive Congress of the right which it has as owner and holder of the legal title, and, by the express language of the Constitution, to

dispose of and make all needful rules and regulations respecting the territory or other property of the United States. The essential inquiry in this case, therefore, is whether complainant had acquired such a vested right, before Congress by law withdrew these lands from the operation of the pre-emption acts.

It has been argued that no law existed at the time Whitney went upon the land, by which unsurveyed land could be legally entered upon with a view to pre-emption. But in the view which the court takes of the matter, it may be assumed that the lands were open to pre-emption. In this concession we also propose to waive the discussion of another question which presents serious difficulties to our minds, in regard to complainant's right to make a valid pre-emption by a forcible intrusion upon land cultivated, inclosed, and peaceably occupied by another man.

But resolving this difficulty in favor of complainant for the present, we are still of opinion that he had not acquired a vested right in the land when Congress acted upon the subject.

What had he done? He had gone upon the land, built a house and barn, and perhaps inclosed some of the ground. He had also applied to the register of the land office, and offered to make a declaration that he had done these things with the intention of making a permanent settlement, and claiming the land under the right of pre-emption. This is all. He had paid no money, nor had he then tendered any. The land officers refused to receive his declaration, and denied his right to pre-empt the land. He never has paid any money, has never received any certificate of pre-emption, and the register and receiver have never, in any manner, acknowledged or admitted his right to make pre-emption of that land. So far as anything done by him is to be considered, his claim rests solely upon his going upon the land and building and residing on it. There is nothing in the essential nature of these acts to confer a vested right, or indeed any kind of claim to land, and it is necessary to resort to the pre-emption law to make out any shadow of such right.

The act of Congress on this subject, to which all the sub
sequent acts refer, and which prescribes the terms, and the
manner of securing title in such cases, is the act of Septem
ber 4th, 1841.* That was an act full of generosity, for it
gave the proceeds of the sales of all the public lands to the
States. The tenth section of the act provides that any per-
son of the class therein described who shall make a settle-
ment upon public lands, of a defined character, and who
shall inhabit and improve the same, and who shall erect a
dwelling thereon, shall be authorized to enter with the
register of the proper land office, by legal subdivisions, one
quarter-section of said land, to include the residence of the
claimant, upon paying the minimum price of such land.
Section eleven provides that conflicting claims for pre-emp-
tion shall be settled by the register and receiver; section
twelve, that prior to such entry proof of the settlement and
improvement required shall be made to the satisfaction of
the register and receiver; and section thirteen requires an
oath to be made by the claimant before entry; section fifteen
requires a person settling on land with a view to pre-emp-
tion, to file within a limited time, a statement of this inten-
tion and a description of the land.

When all these prerequisites are complied with, and the
claimant has paid the price of the land, he is entitled to a
certificate of entry from the register and receiver; and after
a reasonable time, to enable the land officer to ascertain if
there are superior claims, and if in other respects the claim-
ant has made out his case, he is entitled to receive a patent,
which for the first time invests him with the legal title to
the land.

The construction of this act, and others passed since *in
pari materiâ*, in regard to the nature of the rights conferred
on occupants of the public lands, has, of course, received
the consideration of that department of the government to
which the administration of these land laws has been con-
fided. The construction of that department and of the At-
torneys-General to whom the Secretaries of the Interior have

---

* 5 Stat. at Large, 453.

applied for advice, cannot be better expressed than in the language of some of those opinions.

Attorney-General Cushing, in an opinion given in 1856,* says: " Persons who go upon the public land with a view to cultivate now, and to purchase hereafter, possess no rights against the United States, except such as the acts of Congress confer; and these acts do not confer on the pre-emptor, *in posse*, any right or claim to be treated as the present proprietor of the land, in relation to the government."

In the matter of the Hot Springs tract of Arkansas, Attorney-General Bates says:† " A mere entry upon land, with continued occupancy and improvement thereof, gives no vested interest in it. It may, however, give, under our National land system, a privilege of pre-emption. But this is only a privilege conferred on the settler to purchase land in preference to others. . . . His settlement protects him from intrusion or purchase by others, but confers no right against the government."

In the matter of this same Soscol Ranch,‡ Attorney-General Speed asserts the same principle. He says: " It is not to be doubted that settlement on the public lands of the United States, no matter how long continued, confers no right against the government. . . . The land continues subject to the absolute disposing power of Congress, until the settler has made the required proof of settlement and improvement, and has paid the requisite purchase-money."

These opinions, written for the guidance of the Land Department, have been received and acquiesced in by the Secretaries of the Interior, and have come to be the recognized rule of action in that department.

This construction of the law has also been asserted by the courts of last resort in Missouri, Mississippi, Illinois, and California; States in which the population is largely interested in the liberal operation of the pre-emption laws.§

---

* 8 Opinions of the Attorneys-General, 72.    † 10 Id. 57.    ‡ 11 Id. 462.

§ Bower *v.* Higbee, 9 Missouri, 261; Phelps *v.* Kellogg, 15 Illinois, 135; Grand Gulf *v.* Bryan, 8 Smedes & Marshall, 268; People *v.* Shearer, 30 California, 650; and Hutton *v.* Frisbie, in the Supreme Court of California, July Term. 1869.

We are satisfied that this is a sound construction of the pre-emption laws on the question now under consideration.

A series of cases decided in this court, in which the equitable rights of persons claiming under those laws have been protected by the court against the legal title acquired by other parties, through the disregard of their rights by the officers of the Land Department, is supposed to assert principles inconsistent with the construction just stated. We cannot here examine these cases in detail, but we may state that in nearly all of them it will be found that the party whose equitable title was thus protected had, by the action of the officers of the Land Department, and the payment and acceptance of the price, acquired a vested right, which these officers afterwards disregarded, in violation of law. And if in any of these cases the party, asserting successfully his equitable interest, had not acquired a vested right in the just sense of that term, the cases are still widely different from the one under consideration. In all those cases the successful party had established his legal right of *preference of purchase* over the other, under the law as it stood when the land officers decided the case. And it was the action of those officers, and their disregard of the law in refusing to the party the benefit of this preference in purchase, which this court corrected, by compelling the conveyance of the legal title acquired by this violation of law. But in the case before us, and in those to which the opinions of the Attorneys-General refer, it was Congress, the law-making power, which intervened, and, by a new law, withdrew the land from the operation of the pre-emption laws, while the right of preference in purchase remained unexercised, and amounted to no more than this preference.

The courts may very properly correct the injustice done by the land officers, in refusing to accord rights, however inchoate, which are protected by laws still in existence, while they can only consider vested rights, when those rights are sought to be enforced in opposition to the repeal or modification of the laws on which they were founded.

The argument is urged with much zeal that because com-

plainant did all that was in the power of any one to do towards perfecting his claim, he should not be held responsible for what could not be done.

To this we reply, as we did in the case of *Rector* v. *Ashly,** that the rights of a claimant are to be measured by the acts of Congress, and not by what he may or may not be able to do, and if a sound construction of these acts shows that he had acquired no vested interest in the land, then, as his rights are created by the statutes, they must be governed by their provisions, whether they be hard or lenient. That was a case also in which it became important to ascertain when a right to public land became vested, and though it arose under statutes somewhat different from the general preemption law, the principles asserted there, and in the previous cases of *Bagnell* v. *Broderick,†* and *Barry* v. *Gamble,‡* strongly support our conclusion in the present case.

DECREE REVERSED, and the case remanded, with instructions to

DISMISS THE BILL.

---

* 6 Wallace, 142.          † 13 Peters, 436.          ‡ 3 Howard, 32.