## ATHERTON *v.* FOWLER.

1. No right of pre-emption can be established by a settlement and improvement on a tract of public land where the claimant forcibly intruded upon the possession of one who had already settled upon, improved, and enclosed that tract.

2. Such an intrusion, though made under pretence of pre-empting the land, is but a naked, unlawful trespass, and cannot initiate a right of pre-emption.

ERROR to the Supreme Court of the State of California. The facts are stated in the opinion of the court.

*Mr. Montgomery Blair* for the plaintiff in error.
*Mr. S. F. Phillips, contra.*

MR. JUSTICE MILLER delivered the opinion of the court.

This case originates in an action of replevin brought by Page, who died during the progress of the litigation, and is now represented by Atherton, his executor, the plaintiff in error. The plaintiff below obtained possession of the hay, which was the subject of the writ of replevin; but, on trial before a jury, they found he was not entitled to the possession, and judgment for the value of the hay was rendered against him. This judgment was affirmed on appeal to the Supreme Court of the State, and is now brought before us for review on questions which

relate to the rights acquired in the soil from which the hay was cut, or rather which might have been acquired to such soil under acts of Congress.

The hay, which is the subject of controversy, was cut in the summer of 1863, on part of the land embraced within the Vallejo grant of the Soscol ranch.

The history of the title to that ranch is given in the report of *Frisbie* v *Whitney*, 9 Wall. 187. The claim of Vallejo to the confirmation of the grant was finally decided against him in this court, March 22, 1862. By virtue of the thirteenth section of the act of Congress of March 3, 1851 (9 Stat. 633), the land embraced within his claim became public land of the United States whenever it was finally decided to be invalid. No public survey had been extended over these lands at that time, and the whole of the Soscol ranch was held in possession, and had been for years, under the Mexican patent to Vallejo, and by tenants or purchasers under his title.

Nevertheless, a large number of persons who had previously no interest in or claim to or possession of any part of this land invaded it by force, tore down the fences, dispossessed those who occupied it, and built on and cultivated parts of it, under pretence of establishing a right of pre-emption to the several parts which they so seized. The general character of this movement is well described in *Frisbie* v. *Whitney, supra.*

The defendants in this case, though taking no part in the night invasion mentioned in that case, did, during the spring and summer of 1862 and 1863, enter upon the lands in the possession of Page, — land which in every instance was enclosed within fences, and which was in actual cultivation. And this entry was without asking the consent, or having in any way the permission, of those in possession, but by forcibly driving them out. The hay, which is the subject of the controversy, was cut from meadows or grounds set in grass by Page. These facts are stated, or evidence from which the jury had a right to infer them, in a case made by the parties, on which the Supreme Court finally decided it.

But Congress, on the third day of March, 1863, enacted that all settlers on the land claiming under Vallejo might enter the land held by them to the extent of their actual possession at

$1.25 per acre, and have a patent for the same as soon as the surveys were extended over the ranch. So that, when the hay in controversy was cut, the defendants knew, or should have known, that they were mere trespassers on the lands of Page, and had no right to the hay.

It is, however, to be considered that there is the doctrine that a person having the legal title to land, but out of possession, cannot maintain the action of replevin for hay or timber cut on the land. This general doctrine has been modified both by statute and by judicial decision in the several States, until it is not easy to say exactly how much of it is left in any one of the States. In the case before us, the court, on the trial, gave the law on the subject very clearly; and, as it is a doctrine not affected by the Constitution or laws of the United States, we must take it to have been correctly expounded to the jury.

The court instructed them, that, if plaintiff was in the actual possession of the land when the defendants entered, there was no disseisin; and the subsequent possession of defendants did not oust that of the plaintiff, unless they found that they had entered in good faith, with intent to pre-empt the land on which the hay was cut, and that they had the actual possession of it at the time the hay was cut. To the last part of this instruction plaintiff excepted. The court also said: " If you believe from the evidence that the defendants entered in good faith, with intention to pre-empt the land on which the hay was cut, and had actual posssession of it at the time the hay was cut, your verdict should be for the defendants."

The plaintiff asked the court to charge the jury, that, if he was in the actual possession of the land, having cultivated it for several years previously, and the defendants broke through his enclosure against his consent, the entry was unlawful, though the land might be public land, the prior right of pre-emption belonging to him who had the prior and continued possession. This the court refused.

In short, it is obvious that the case was made by the court to turn on the assumption that the land was, in its then condition, liable to be pre-empted by defendants, against the wishes of plaintiff, and that, to effect the entry and cultivation necessary to establish the right of pre-emption, the defendants could, by

force and violence and by breaking into an actual enclosure and by turning the plaintiff out, acquire such right of pre-emption, and at the same time a *bona fide* possession.

Unless the laws of the United States justify this conduct, the instructions of the court were erroneous, and to the prejudice of the plaintiff in a matter involving his rights under the acts of Congress.

At the time this action was tried, Page had obtained title to the land under the act of March 3, 1865. This related back to his possession under the Vallejo grant; and the title in this action was not disputed. It was simply a question before the court in that trial, therefore, whether the intention to pre-empt the land changed what would otherwise have been a mere trespass into a *bona fide* possession which would defeat the present action.

Undoubtedly, there have been cases, and may be cases again, where two persons making settlement on different parts of the same quarter-section of land may present conflicting claims to the right of pre-emption of the whole quarter-section, and neither of them be a trespasser upon the possession of the other, for the reason that the quarter-section is open, unenclosed, and neither party interferes with the actual possession of the other. In such cases, the settlement of the later of the two may be *bona fide*, for many reasons. The first party may not have the qualifications necessary to a pre-emptor, or he may have pre-empted other land, or he may have permitted the time for filing his declaration to elapse, in which case the statute expressly declares that another person may become pre-emptor, or it may not be known that the settlements are on the same quarter. *Johnson* v. *Towsley*, 13 Wall. 72; sect. 15, act of Sept. 4, 1841, 5 Stat. 455.

Bu all these cases suppose that the parties began their possession and made their settlements and built their houses on lands not in the actual possession of another. It is not to be presumed that Congress intended, in the remote regions where these settlements are made, to invite forcible invasion of the premises of another, in order to confer the gratuitous right of preference of purchase on the invaders. In the parts of the country where these pre-emptions are usually made, the prorec-

tion of the law to rights of person and property is generally but imperfect under the best of circumstances. It cannot, therefore, be believed, without the strongest evidence, that Congress has extended a standing invitation to the strong, the daring, and the unscrupulous to dispossess by force the weak and the timid from actual improvements on the public land, in order that the intentional trespasser may secure by these means the preferred right to buy the land of the government when it comes into market.

A careful examination of the laws concerning the survey and sale of our public lands will show that nothing of this kind is sanctioned, and that so many other ways are open to purchasers of these lands that no such proceeding is necessary to enable any one to secure his rights. In the earliest stages of our land system no right or interest could be secured by the individual in any public land until it had been surveyed into legal subdivisions. Nor after this had been done was it subject to sale, until, by a proclamation of the President, it was brought into market. This proclamation always fixed a time and place when the lands within a given district were to be offered for sale at public auction ; and until all of them were sold which could be sold in this manner, at prices above the minimum fixed by law, no one could make a private entry of a particular tract, or establish a claim to it. The scenes of violence, fraud, and oppression, and the combinations which attended these sales, and the wrongs perpetrated under them, led to the law of pre-emption. It often occurred that emigration, in advance of the readiness of the public lands for these sales, had caused hundreds and thousands to settle on them ; and, when they came to be sold at public auction, their value, enhanced by the houses, fences, and other improvements of the settler, placed them beyond his reach, and they fell into the hands of heartless speculators. To remedy this state of things the pre-emption system was established. This, at first, was only applicable to lands which had been surveyed. But gradually this was changed, until, in 1862, pre-emptions were allowed, under proper restrictions, on unsurveyed lands as well as those surveyed. Act of June 2, 1862, 12 Stat. 418.

It may, therefore, be said that at the time the transactions

occurred of which we are speaking there were three modes of securing title to public lands: 1. By purchase at the public land sales ordered by the President. 2. By private entry; that is, by going to the land-officer and paying at the rate of $1.25 or $2.50 per acre for any land subject to private entry or sale at those rates respectively. 3. By pre-emption.

. Both the former modes contemplated the immediate payment of the money, and the right of the party to the land was fixed when this was done. He had then a vested interest, which became a perfect legal title when he received his patent. This was usually after such delay as was necessary to ascertain if there were any conflicting claims or rights to the land.

But the pre-emption of land did not require or admit of payment at the time the right of pre-emption was exercised The land might not have been surveyed, and then it could not be identified or described so as to cause a patent to issue on it. The law also intended to give the settler time to build a house, break up the ground, and make a settlement first and payment afterwards.

During this preliminary period he had no vested right to the land; but, as we have elsewhere decided, he did thus acquire the right of preference in the purchase. That is to say, if he made the necessary settlement and improvement, and the necessary declaration in writing, no other person could buy the land until the period elapsed which the law gave him to pay the purchase-money. *Frisbie* v. *Whitney*, 9 Wall. 187; *Hutchings* v. *Low*, 15 id. 77.

. Among the things which the law required of a pre-emptor, and the principal things required of him to secure his right, were: 1. To make a settlement on the land in person. 2. To inhabit and improve the same. 3. To erect a dwelling-house thereon. ᐧ Sect. 2259, Rev. Stat.

At the moment the land on which the hay in this case was cut became liable to pre-emption, the whole of it was, by the various persons claiming under Vallejo, 1, settled on by them in person; 2. inhabited and improved by them; and, 3, it had dwellings erected on it by them.

Unless some reason is shown, not found in this record, these were the persons entitled to make pre-emption, and no one else.

But suppose they were not. Does the policy of the pre-emption law authorize a stranger to thrust these men out of their houses, seize their improvements, and settle exactly where they were settled, and by these acts acquire the initiatory right of pre-emption? The generosity by which Congress gave the settler the right of pre-emption was not intended to give him the benefit of another man's labor, and authorize him to turn that man and his family out of their home. It did not propose to give its bounty to settlements obtained by violence at the expense of others. The right to make a settlement was to be exercised on unsettled land; to make improvements on unimproved land. To erect a dwelling-house did not mean to seize some other man's dwelling. It had reference to vacant land, to unimproved land; and it would have shocked the moral sense of the men who passed these laws, if they had supposed that they had extended an invitation to the pioneer population to acquire inchoate rights to the public lands by trespass, by violence, by robbery, by acts leading to homicides, and other crimes of less moral turpitude.

We have not been able to find any decision of the courts directly in point on this question. But in the case of the *United States* v. *Stanley* (6 McLean, 409), Mr. Justice McLean gave expression to the opinion, that, where a man was engaged in erecting a house in order to make a pre-emption claim to lands purchased of the Miami Indians, another person, who by force turned him out of the house, and having finished it took up his residence there, could not by that proceeding acquire a valid settlement, unless the other party voluntarily withdrew all claim to the property. The case in regard to the trespass is very like the one before us, and though the validity of the entry of the trespasser was only remotely in question, the remark of the learned justice, who was familiar with the laws regulating the sales of public lands, is entitled to respect.

So, also, in the case of *Frisbie* v. *Whitney*, before mentioned, this court said, that while it was not necessary to decide it, there were serious difficulties in regard to complainant's right to make a valid pre-emption by a forcible intrusion upon land cultivated, enclosed, and peaceably occupied by another man.

In the present case, we are met with that question directly in our way, and we are of opinion that it cannot be done.

It follows that the defendants could not have made any lawful entry on the lands where the hay was cut in this case; that no law existed which gave them any right to make such an entry; that they were mere naked trespassers, making an unwarranted intrusion upon the enclosure of another, — an enclosure and occupation of years, on which time and labor and money had been expended, — and that in such a wrongful attempt to seize the fruits of other men's labor there could be no *bona fide* claim of right whatever. The instruction of the court that this could be done, founded on an erroneous view of the pre-emption law, was itself erroneous, and the judgment founded on it must be reversed.

The judgment of the Supreme Court of California will, therefore, be reversed, and the case remanded with instruction to order a new trial, and for further proceedings in conformity with this opinion; and it is

*So ordered.*

MR. CHIEF JUSTICE WAITE, with whom concurred Mr. JUSTICE CLIFFORD, dissenting.

I dissent from this judgment. It is not claimed that, when the defendants entered, Page had title to the lands on which the hay was cut. After the judgment of this court in *United States* v. *Vallejo* (1 Black, 541), against the validity of the " Soscol " grant, the lands became public lands of the United States; and the occupancy of Page from that time, covering as it did a tract of more than eight hundred acres, did not, in my opinion, prevent a peaceable entry by the defendants, in good faith, for the purposes of pre-emption. The case was fairly put to the jury upon that question.