UNITED STATES v. LA CHAPPELLE. SAME v. ABERCROMBIE.
· SAME v. RICHARDSON. SAME v. ROBINSON.
SAME v. WILLIAMS.

(Circuit Court, D. Washington, E. D. May 31, 1897.)

1. PUBLIC LANDS—OPENING INDIAN RESERVATION—INVALID TREATY—CANCELLATION OF ENTRIES.

In 1884 an agreement was negotiated between the government and an Indian chief named Moses, purporting to represent the Indians living on the Columbia reservation, in Washington territory, by which the Indians, in consideration of a sum of money, agreed to remove to another reservation, and that the Columbia reservation should be opened to settlement, except that any Indians who desired to remain might do so, and lands not exceeding 640 acres to each family should be selected for them. Certain Indians living on the reservation, who did not acknowledge the authority of Moses, refused to be bound by this agreement, though they indicated a willingness to make a similar one on their own account. Through the misunderstanding of an agent, the position taken by these Indians was incorrectly reported to the government, and, without making any provision for them, the land was opened to settlement. Certain white men attempted to settle on the lands, and were resisted by the Indians, who were thereupon forcibly removed by United States troops, and imprisoned. During their imprisonment, the white settlers seized their improvements, settled on the land, and filed homestead declarations, which were accepted. The government having learned the facts as to the Indians' position in the matter, contest proceedings were instituted in the land department, and the entries were finally canceled, though the settlers had in the meantime made improvements at considerable expense; and suits were brought to oust them from possession. *Held*, that the lands in question never became part of the public domain which could lawfully be taken up under the homestead law, and that neither by estoppel against the government, nor as bona fide purchasers, had the settlers acquired any rights to hold the lands.

2. ESTOPPEL AGAINST GOVERNMENT—PRIVATE RIGHTS.

Though the doctrine of estoppel may be applied in some cases against. the government, it cannot be applied to give one private individual an advantage over another, or to devest existing rights of individuals without their consent.

F. C. Robertson, Asst. U. S. Atty.
Blake & Post, J. H. Dawes, and W. R. Bell, for defendants.

HANFORD, District Judge. These several actions were brought by the United States, to evict the defendants from certain lands situated near Lake Chelan, in Okanogan county, which they respectively claim to have settled upon and improved, and to which they now claim to have lawful possession, under and by virtue of the homestead laws of the United States. Previous to the year 1884 there was a large Indian reservation, called the "Columbia Indian Reservation," embracing the several tracts now claimed by the defendants. As it was considered unnecessary, and detrimental to the interests of the white people, to withhold from settlement so

large a section of Washington territory, for the occupation of a comparatively small number of Indians, an agreement was negotiated in Washington city, between the officers of the Indian department, on behalf of the United States government, and an Indian chief named Moses, on behalf of the Indian occupants, whom he assumed to represent, which agreement, by its terms, provided for the payment of a large sum of money to the Indians, and that provision should be made for their removal to the Colville Indian reservation, and, in consideration thereof, the Indians relinquished to the United States their rights in and to the Columbia reservation, and consented that the same should be thrown open to settlement by the white people.    The agreement contained a provision, however, that such of the Columbia Indians as should elect to remain, and to acquire title to lands within the Columbia reservation, might do so, and there should be selected for such Indians lands not exceeding 640 acres for each head of a family.    Said agreement was confirmed, and provisions made for carrying the same into effect by an act of congress approved July 4, 1884 (23 Stat. 79, 80).    At that time the region round about the outlet of Lake Chelan was occupied by a small independent band of Indians, who have never recognized Moses as their chief, but, on the contrary, have their own hereditary chief, and they always denied the authority of Moses to make disposition of their lands, and refused to receive any part of the money appropriated by the act of congress to be paid to the Indians as consideration for the extinguishment of their title to the Columbia reservation.    An agent of the Indian department was sent to induce these Chelan Indians to remove to the Colville reservation, or, if they elected to remain upon the Columbia reservation, to select such lands as they wished to have set apart for their homes, and to make survey of the land so selected.    This agent failed to induce the Indians to conform to the agreement, and the act of congress aforesaid, in any respect; and he also failed to comprehend that these Indians had not disposed of any of their rights, nor authorized Chief Moses to sell their lands.    The young chief, who is commonly known by the name of Long Jim, and who, by his appearance and conduct, has shown himself to be of more than average intelligence for an Indian, and also a man of high spirit and dignified bearing, responded to the overtures of the government's agent, saying in substance:

"I and my people are upon the soil which has always been our home, and the home of our ancestors for many generations. We do not wish to remove. We do not have to select land, for we now occupy the land which has always been in our possession. We have no disposition to interfere with the white people, and we wish to live in peace, and maintain friendly relations with the government at Washington, but to do as you request would be displeasing to the Great Spirit."

A great deal of trouble to the government and to the band of Indians and to the defendants might have been avoided if the agent had been able to appreciate the diplomacy of Long Jim's oration, and had conveyed to the Indian department the idea which Long Jim intended should be conveyed,—that is, that he meant to assert the rights of his people; that he repudiated the action of Chief

Moses in assuming to make a contract for them, but, for the sake of peace, they were willing to make a new agreement, if the government would recognize their right to act for themselves. Instead of doing this, the agent reported that the Indians were obstinate and unmanageable; and after a time, the government, ignoring their rights, and without making any provision for them, opened the reservation to settlement.

The testimony shows that these Indians have always been thrifty and able to maintain themselves, without annuities from the government. Besides hunting and fishing, they have engaged in stock raising, and have plowed and cultivated sufficient land to provide winter feed for their stock, and corn and vegetables to supply their own demands. Their houses, fences, and improvements would not excite admiration in the New England states, but they were sufficient for shelter, and to protect their growing crops from intrusion, until they were disturbed by white settlers. In the year 1889 the first attempt was made by the defendant La Chappelle to take possession of the lands in controversy. The defendant was immediately notified by Long Jim that the land was his, and the attempt to settle thereon was for the time being abandoned. The next year the same defendant returned, and, showing a more determined spirit, he provoked the Indians into making a demonstration such as would be natural on the part of any person claiming to own land against one whom he regarded as a trespasser. This was reported to the Indian department, and thereupon the agent of the Colville reservation, assisted by a company of soldiers, arrested Long Jim and several of his men, and incarcerated them in Ft. Spokane for a period of more than two months. While the Indians were imprisoned, Mr. La Chappelle established his residence upon the land which he claims, and took possession of the crops which the Indians had planted; and some of the other defendants also made their settlements, and used the timber of the Indians' houses and rude fences for their own purposes, and they were allowed to file their homestead declarations in the United States district land office. The other defendants made their settlements and filings subsequent to this time, except the defendant John Francis Williams, whose homestead declaration, when tendered at the land office for filing, was rejected. After the imprisonment of said Indians, the officers of the Indian department came to have a better understanding of the situation and rights of these Indians, and began to actively assist them in acquiring title to their homes, under the provisions of the public land laws of the United States. The measures adopted took the form of contest proceedings in the land department, which resulted finally in a decision by the secretary of the interior in favor of the Indians, and the cancellation of the homestead entries which had been made by the defendants. While said contests were in progress, the defendants made large expenditures of money and labor in improving their holdings. The defendants are all qualified and entitled to acquire land under the homestead law of the United States. They have fully complied with the law as to actual residence upon and cultivation and improvement of their claims. Their improvements consist of houses, fences,

orchards in bearing, and conveniences and comforts for home life, and in each case are of the value of several thousand dollars; so that the cases must be determined upon the question as to whether the defendants or the Indians have a superior right to the lands.

The defendants invoke the doctrine of estoppel in bar of the prosecution of these actions by the United States, their contention being that the president having, by his proclamation, declared the Columbia Indian reservation to be a part of the public domain, and open to settlement under the homestead law, except as to the portions thereof selected and allotted to other Indians, pursuant to the act of July 4, 1884, and the officers of the Indian department having exercised their authority, and used the military power of the United States to subjugate these Chelan Indians when they were making demonstrations to intimidate settlers, and the officers of the land department having received and filed applications to enter the lands under the homestead law, and the defendants having on the faith of said acts of the government relied, and expended their money and labor in making improvements, for the purpose of acquiring title under the homestead law, the prosecution of these causes is so utterly inconsistent with the previous acts of the officers of the executive branch of the government, and so prejudicial to the defendants, as to amount to a legal fraud.

The authorities cited by counsel for the defendants prove that the doctrine of estoppel may be applied in some cases against the government, but not in any case to give one private individual an advantage over another, or to devest existing rights of individuals without their consent. The laws of the United States and the policy of the government have from the earliest times recognized the Indians' right of occupancy, until the same has been formally relinquished. I think that congress has the power and may dispose of lands in the possession of the Indians, without their consent. But, without authority expressly conferred by an act of congress, officers of the executive branch of the government cannot dispose of lands to individual citizens while the Indians are in actual possession, and their right of occupancy has not been extinguished. The position of the defendants is, in my opinion, untenable for another reason. The supreme court has so often decided that it is the right and duty of the secretary of the interior to cancel private entries of public lands whenever it shall be discovered that such entries were allowed through mistake or inadvertence, or when the land is for any reason not subject to such entry, that the question is no longer open for discussion, and the applicability of the rule on this subject to the cases on trial is, to my mind, apparent.

It is next contended by the defendants that the Chelan Indians forfeited all right to the land within the Columbia reservation, under the provisions of the act of congress of July 4, 1884, by their failure to make selections, within one year, of the lands to be allotted for their use. As to this there are two answers. In the first place, these Indians were not bound by the agreement entered into by Chief Moses, for the reason that they never gave their assent, and Moses had no authority to represent them; and, in the second place, the

act of congress contained no provision forfeiting rights for failure on the part of the Indians to make selection of particular land. The law only requires them to elect within one year whether they will continue to reside within the boundaries of the former Columbia reservation, and it is provided:

"That, in case said Indians so elect to remain in said Columbia reservation, the secretary of the interior shall cause the quantity of land therein [in the Moses agreement] stipulated to be allowed them to be selected in as compact form as possible, the same when so selected to be held for the exclusive use and occupation of said Indians, and the remainder of said reservation to be thereupon restored to the public domain, and shall be disposed of to actual settlers under the homestead laws only. * * *"

The law imposes upon the secretary of the interior, and not upon the Indians, the duty of selecting lands for their use; and the president was not authorized to restore any part of the Columbia reservation to the public domain, and to open the same for settlement under the homestead law, until after selections for the use of the Indians had been made. The proclamation of the president opening the reservation to settlement, having been issued prematurely, may have deceived the defendants as to their rights, but it could not on that account have the effect to defeat the prior and superior rights of the Indians to remain in the occupation of their habitations and the quantity of land deemed by congress to be necessary for their use. The duty of the secretary of the interior prescribed by the act of congress could only be discharged by making the selections of lands for the Indians, and, not having been previously discharged, it remained to be performed after the proclamation.

I place my decision upon the ground that the lands claimed by the defendants have never become part of the public domain, which could be lawfully taken by settlers under the homestead law. The law authorizes settlers to take only unoccupied public lands, to which the Indian title had been extinguished. Rev. St. U. S. §§ 2257–2289. Even if the president's proclamation be regarded as an authoritative declaration that the Indian title had been extinguished, and though it be conclusive upon the Indians, still the continued occupation of the land by the Indians was founded upon natural right, and their rights were recognized by the law; so that their possession amounted to a legal appropriation for their use, and on that account, by the terms of section 2289, it is not land subject to be taken under the homestead law.

The loss which the defendants must suffer is serious, and is to be regretted, and yet they are not in a situation to claim the rights of bona fide purchasers, without notice. The possession of the Indians, prior to the initiation of their settlements, had been actual, visible, continuous, and notorious. The testimony shows that other citizens had seen that the lands in controversy were good, and desired to take the same, but were deterred by the possession of the Indians; and from the time Mr. La Chappelle made his first attempt to initiate a settlement, until the present time, the Indians have been active and diligent in asserting their rights, and giving notice thereof. An element of actual bad faith on the part of this defendant is

shown by his own admission that, while the Indians were in prison, he took possession of their growing crops, and afterwards garnered the same for his own use. In seeking to acquire the lands which they now claim, each of the defendants voluntarily entered into a controversy with the Indians, assuming the risk of a total loss of their improvements; and the consequence of their failure to defeat the Indians in the controversy affords no legal ground for trampling down superior rights.

In my opinion, these cases come fairly within the reason of the decision in the case of Atherton v. Fowler, 96 U. S. 513–520. The pith of the opinion by Mr. Justice Miller in that case is in the following excerpt:

"Does the policy of the pre-emption law authorize a stranger to thrust these men out of their houses, seize their improvements, and settle exactly where they were settled, and by these acts acquire the initiatory right of pre-emption? The generosity by which congress gave the settler the right of pre-emption was not intended to give him the benefit of another man's labor, and authorize him to turn that man and his family out of their home. It did not propose to give its bounty to settlements obtained by violence at the expense of others. The right to make a settlement was to be exercised on unsettled land; to make improvements on unimproved land. To erect a dwelling house did not mean to seize some other man's dwelling. It had reference to vacant land, to unimproved land; and it would have shocked the moral sense of the men who passed these laws if they had supposed that they had extended an invitation to the pioneer population to acquire inchoate rights to the public lands by trespass, by violence, by robbery, by acts leading to homicides, and other crimes of less moral turpitude."

The several Indians were not holding particular tracts, with defined boundaries, and they asserted their claim to an area much greater than the government has permitted them to retain. But they are not to suffer total deprivation of rights on this account. They lived together as one family, and their actual presence was equivalent to an inclosure of a quantity of land, reasonably sufficient for their necessities. The defendants therefore, in making entries, were, of necessity, aggressors against the Indians, at their own doorstep, and they acquired no legal rights by their wrongdoing. Findings of fact will be prepared, and a judgment entered in each case in accordance with this opinion.