Albert M. LIPSCOMB,
Plaintiff–Appellant,

v.

UNITED STATES of America, Manuel Lujan, Jr., Secretary of the Interior, Amoco Production Company, Defendants–Appellees.

No. 89–7399.

United States Court of Appeals,
Eleventh Circuit.

July 19, 1990.

Allan R. Chason, Chason & Chason, P.C., Bay Minette, Ala., for plaintiff-appellant.

Hugh Craig Forshner, Amoco Production Co., New Orleans, La., Eugene A. Seidel, Asst. U.S. Atty., Mobile, Ala., for defendants-appellees.

Ellen J. Durkee, Appellate Section, Lands Div., Dept. of Justice, Washington, D.C., for U.S. and Manuel Lujan, Jr., Secretary of Interior.

Before JOHNSON, Circuit Judge, HILL [*] and HENLEY [**], Senior Circuit Judges.

JOHNSON, Circuit Judge:

Albert M. Lipscomb appeals from the district court's grant of summary judgment in favor of the federal defendants in his suit under the Color-of-Title Act, 43 U.S.C.A. § 1068 *et seq.*

[*] *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

[**] Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. The land had been under lease to Amoco since March 16, 1979. On May 14, 1982, the federal land and adjacent lands were formed into an oil and gas unit. On November 6, 1982 Amoco began drilling operations on the adjacent land. Amoco and the United States entered into a communitization agreement to develop the unit's oil and gas; a communitization agreement brings together separately owned interests in small tracts for the purpose of obtaining a well permit under applicable spacing rules. The agreement was effective as of October 26, 1982. Amoco plugged and abandoned the well on April 7, 1987.

2. Public property cannot be acquired by means of adverse possession. 28 U.S.C.A. § 2409a(g); *United States v. Pappas,* 814 F.2d 1342, 1343 n. 3 (9th Cir.1987); *United States v. Stubbs,* 776 F.2d 1472, 1476 (10th Cir.1985). The Color-of-Title Act, however, gives those who have met criteria similar to those required for adverse possession under the common law the right or privilege to purchase the lands which they have occupied.

## I. STATEMENT OF THE CASE

Appellant Lipscomb's family has farmed a parcel of approximately 41 acres of real property in Baldwin County, Alabama since 1936. On June 16, 1980 Lipscomb acquired title by warranty deed to the land from his mother. He subsequently discovered that the United States actually owned the land, and that the government never had issued a patent to his family. The land also was subject to an outstanding oil, gas, and mineral lease in favor of Amoco Oil Company.[1] Pursuant to the lease agreement between the government and Amoco, proceeds from the sale of any minerals exploited by Amoco attributable to the federal tract were to be paid into an escrow account.

Under a cover letter dated October 27, 1982, Lipscomb filed a color-of-title application with the Bureau of Land Management ("BLM") on January 12, 1983. He made the application under the Color-of-Title Act, 43 U.S.C.A. § 1068,[2] and requested a patent on the property. Lipscomb requested that no mineral rights be reserved with the patent.[3] The application was a class two application.[4]

3. Ordinarily a patent issued under the Color-of-Title Act contains a clause reserving the underlying mineral rights to the United States.

4. Under 43 U.S.C.A. § 1068, a private person may acquire government land under either a class one or a class two patent. Class one applicants must demonstrate good faith, peaceful adverse possession by the claimant or his predecessor under color of title for more than 20 years, and the placing of valuable improvements on the land or reducing some part of it to cultivation. Government issuance of patents for those proving class one qualifications is mandatory. 43 U.S.C.A. § 1068(a). Class two applicants must prove good faith, peaceful adverse possession of the lands by the claimant or his predecessor continuously since January 1, 1901, and payment of all *ad valorem* taxes due on the property. Issuance of class two patents is discretionary with the Secretary of the Interior. 43 U.S.C.A. § 1068(b). If the claimant meets the class two qualifications, or if he meets class one qualifications and also can prove continuous adverse possession since January 1, 1901, and if he requests that no minerals be reserved, the conveyance must include the minerals underlying the lands unless the lands are subject to an outstanding mineral lease or are

Upon review of Lipscomb's application, the BLM determined that more information was necessary to establish chain of title; Lipscomb sent the information by letter.[5] The BLM suggested that Lipscomb amend the application to request a class one application, and Lipscomb did so. On July 26, 1985, the BLM determined that Lipscomb was qualified to receive a class one patent without mineral reservation upon satisfaction of three conditions. Lipscomb had to pay the purchase price, publish notice in a local paper, and submit proof of publication to the BLM. A purchase price of $2,654.00 was established when the mineral rights valuation issued for the property on August 1, 1985.

On August 29, 1985, the BLM informed Lipscomb that the United States had taken the position that the revenue accrued in the Amoco escrow account was the property of the United States. Lipscomb disagreed, contending that because he and his family had occupied the land for some time, the money made from the sale of the mineral resources belonged to him. By letter dated September 26, 1985, Lipscomb protested the escrow issue to Stuart Carlson of the BLM. Lipscomb paid the purchase price to the BLM on October 1, 1985, and on January 8, 1986, a land patent without mineral reservation was issued to Lipscomb. On February 24, 1986, the BLM announced that the United States was entitled to all funds accruing to the escrow account between the date that Lipscomb submitted his application and the date that he met all of the statutory requirements. Lipscomb met the last of the statutory requirements on October 1, 1985, when he paid the purchase price.[6] The BLM advised Amoco,

however, to credit Lipscomb with all revenue accruing after January 8, 1986, which was the date on which the patent issued, and to credit the United States with the revenue accruing before that time.

Lipscomb appealed the BLM decision to the Interior Board of Land Appeals ("IBLA"). The IBLA concluded that equity rights do not vest in a class one claimant until the patent issues, and on October 15, 1987, the IBLA affirmed the decision of the BLM. On December 9, 1987, Lipscomb appealed the IBLA decision to the district court by means of the Declaratory Judgment Act (28 U.S.C.A. § 2201) and the Administrative Procedure Act (5 U.S.C.A. § 702). He named the Secretary of the Interior, the United States, and Amoco as defendants.[7] Both Lipscomb and the federal defendants moved for summary judgment. On May 2, 1989 the district court granted summary judgment in favor of the federal defendants, holding that equitable ownership did not vest in Lipscomb until he met all the requirements of the Act. The district court also adopted the agency interpretation of the Act. The district court ordered, however, that the proceeds accrued in the escrow account prior to August 15, 1985 be paid to the United States, with all proceeds accrued after that date to go to Lipscomb.[8]

On appeal, therefore, we are faced with a confusing array of dates. Lipscomb maintains that his rights vested as of the date of application (January 12, 1983), the agencies maintain that his rights vested when the patent issued (January 8, 1986), the district court maintains that his rights vested on the date of the mineral valuation

within a mineral withdrawal. 43 U.S.C.A. § 1068b.

5. There were several gaps in Lipscomb's chain of title, and initially there was some question as to when Lipscomb knew that he did not own the land. These questions were resolved through Lipscomb's letters.

6. Between the time that Lipscomb argued his rights vested in 1982 and the time the BLM found his rights vested in October 1985, Amoco deposited some $300,000 in the escrow account.

The practical result of the BLM decision, therefore, was a finding that the $300,000 belonged to the government.

7. Amoco is merely a stakeholder in the proceedings; it will pay the proceeds from the escrow account to the prevailing party.

8. The district court picked the August 15, 1985 date because it believed that the mineral rights valuation for the property was issued on that date. In fact, the mineral rights valuation issued on August 1, 1985.

(August 1, 1985),[9] and the government maintains that his rights vested when he met the last of the statutory requirements (October 1, 1985). We must determine when an applicant for a patent to public lands under the Color-of-Title Act who filed his original patent application as a class two application, then amended his application to be a class one application, and who satisfies the requirements of a class one claim, acquires a vested right to the mineral rights underlying the land.

## II. ANALYSIS

■■■ Conclusions of law rendered by summary judgment are subject to the same standard of review as any other question of law raised on appeal. *Erwin v. Westfall,* 785 F.2d 1551, 1552 (11th Cir.1986), *aff'd,* 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988). Thus this Court's review of the district court's interpretation of 43 U.S. C.A. § 1068 is *de novo.* The standard used in reviewing an agency interpretation of a statute which it administers depends on whether Congress has spoken on the interpretational issue. If Congress has spoken to the precise question at issue, no deference is required. *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If Congress has not addressed the issue, the court must defer if the agency interpretation is reasonable. *Id.* at 843–44, 104 S.Ct. at 2781–83. A finding of reasonableness does not require a finding that the agency interpretation was the only possible construction, or that the agency made the same finding the court would have made. *Curse v. Director, Office of Workers' Compensation*

*Programs,* 843 F.2d 456, 460 (11th Cir. 1988) (quoting *Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11). A court may set aside an agency decision if the decision is (1) arbitrary, capricious, an abuse of discretion, or contrary to law, or (2) in excess of statutory authority. 5 U.S.C.A. § 706(2)(A), (C). *See also Charter Peachford Hosp., Inc. v. Bowen,* 803 F.2d 1541, 1543 (11th Cir.1986).

### A. Congress Has Not Expressed Intent With Respect To When Rights Vest Under Section 1068

■■■ Lipscomb first argues that the district court owed no deference to the IBLA's interpretation of the Color-of-Title Act because Congress had a specific intent regarding this issue. In support of this contention, he points to the statement in the accompanying Senate report that the 1953 amendment[10] to the Act was intended to "create a vested right in the land on the part of a settler with a genuine color-of-title claim which meets the requirements." S.Rep. No. 588, 83rd Cong., 1st Sess., *reprinted in* 1953 U.S.Code Cong. & Admin. News 2014, 2015. This statement does not clarify the issue of *when* the rights vest; Lipscomb even admits this in his brief. Because the statute makes no reference to when the rights vest, and because the legislative history shows no congressional intent on the issue, the district court correctly deferred to the agency interpretation of the Act if that interpretation was reasonable.

### B. The Agency Interpretation of the Statute Was Reasonable

The IBLA found that,

9. Both parties appear to agree that August 15, 1985, the date picked by the district court, is not the date on which ownership vested. Similarly, neither party argues that the date on which the patent was issued is relevant. Yet the government has requested that we affirm the district court's holding, in spite of the fact that the district court based its award on the erroneous August 15, 1985 date. Apparently the government feels that whatever amount of money which was deposited in the escrow account between August 15 and October 1, 1985 is too negligible to squabble over. Regardless of whether this is true, we cannot and will not

simply affirm the district court's holding that ownership vested on August 15, 1985 when this finding has no factual or legal basis.

10. The original Color-of-Title Act provided relief only for those claims now designated as class one claims. The Act was amended in 1953 to make sale of class one claims mandatory, to create class two claims, and to make sale of mineral rights adversely possessed since January 1, 1901 mandatory if the claimant met the requirements of the Act.

although appellant's rights to the land vested upon compliance with the statutory requirements coupled with the filing of an application under the Color of Title Act, this did not entitle him to all appreciation in the value of the land which occurred prior to patent or to the benefit of mineral exploitation of the land prior to patent.

The agency reached this conclusion by looking at the IBLA decision in *Benton C. Cavin*, 83 IBLA 107 (1984). In *Benton C. Cavin*, the IBLA considered the question of when rights vest as the question pertained to appraisal under section 1068a. That section states that when an application for patent is filed, the Secretary of the Interior shall cause the lands to be appraised "on the basis of the value of such lands at the date of appraisal." The appellant in *Benton C. Cavin* argued that the purchase price should have been determined by the value of the land at the time of application for the patent. The IBLA rejected this interpretation, stating that "if Congress had intended all appreciation in value from the date of application to be considered an element of the applicant's equity, Congress certainly would merely have directed that the appraisal be based on the value of the land at the time of the application." 83 IBLA 127–28. The IBLA applied the same reasoning in Lipscomb's case to determine that equitable ownership does not vest in the claimant at the time of the application alone, but rather after the claimant has both filed an application *and* satisfied all of the statutory requirements for ownership.

Lipscomb argues that the IBLA's interpretation is unreasonable. Pointing to the portion of the IBLA's decision where the agency states, "although appellants' rights to the land vested upon compliance with the statutory requirements coupled with *the filing of an application* under the Color-of-Title Act, . . . ." (emphasis added), Lipscomb claims that the agency specifically conceded that his right to the land vested at the time he filed his application, and then contradicted itself by finding that he was not entitled to the mineral values from that time. If such were the case, the IBLA

effectively would have authorized the Secretary to withdraw the mineral values from sale after Lipscomb's rights to them had vested. Such a withdrawal would have been invalid; because issuance of class one patents is mandatory under section 1068(a), the Secretary cannot withdraw from sale a parcel of public lands to a person who has met the class one requirements for that parcel.

█ The IBLA decision, however, did not authorize the withdrawal of a vested interest. Lipscomb ignores the crucial language in the agency's holding. The IBLA did not state that Lipscomb's rights vested upon filing of his application *alone*, but stated that the rights vested upon filing of the application *and compliance with the statutory requirements*. This distinction is crucial. Section 1068 is not an adverse possession statute; one cannot acquire public lands through adverse possession. *See* 28 U.S.C.A. § 2409a(g). Rather, section 1068 is a sale statute. It commands or permits the Secretary to sell parcels of public lands on the fulfillment by the applicant of certain conditions. For a class one claimant, the conditions to be fulfilled are holding the tract in good faith, holding the tract in peaceful, adverse possession under color of title for more than twenty years, placing valuable improvements on the land or cultivating the land, and *paying the purchase price*. If any one of these conditions is not met, the Secretary does not have to sell. Merely filing an application does nothing more than give the applicant a right of preference over other claimants. The district court stated this idea quite clearly:

> Upon the filing of an application under the Color of Title Act, a right to have an application processed under the Act in preference to others vests in the claimant. No equitable right to ownership of the property will vest in the claimant until all requirements of the Act have been met.

Thus, up until the time that the claimant tenders the purchase price for the land, the Secretary does not have to sell it to him, and possession does not vest.

The idea that title does not vest until the statutory requirements are met has historical support. The IBLA interpretation of the Color-of-Title Act is identical to the operation of the Act's predecessor, the General Pre-emption Act of 1841, 5 Stat. 453.[11] The General Pre-emption Act required the claimant to settle on the public land, to improve it, and to erect a dwelling on it. *Atherton v. Fowler,* 96 U.S. 513, 518, 24 L.Ed. 732 (1877). Even when a claimant had met these qualifications, he still had no vested interest in the land; he had "the right of preference in the purchase." *Id.* The Supreme Court explained:

> The right of pre-emption is the right to enter lands at the minimum price in preference to any other person, if all the requirements of the law are complied with. The prior settlement, declaratory statement and proof are not the pre-emption, but only the means of securing the right of pre-emption.

*Nix v. Allen,* 112 U.S. 129, 136, 5 S.Ct. 70, 74, 28 L.Ed. 675 (1884). *See also Frisbie v. Whitney,* 76 U.S. (9 Wall.) 187, 195, 19 L.Ed. 668 (1869) ("A mere entry upon land, with continued occupancy and improvement thereof, gives no vested interest in it. It may, however, give ... a privilege of pre-emption. But this is only a privilege conferred on the settler to purchase land in preference to others.... His settlement protects him from intrusion or purchase by others, but confers no right against the government.").

The above-described operation of the General Pre-emption Act, and the similar interpretation given the Color-of-Title Act by the IBLA, are the only logical interpretations which comport with 28 U.S.C.A. § 2409a(g), which states that one cannot acquire government property by adverse possession. If Lipscomb had obtained vested, equitable interest in the property at the time he filed his application, effectively he would have received the land by adverse possession, because he had paid no purchase price at that time. Because Lipscomb statutorily is prohibited from obtaining public land by adverse possession, it follows that he could not have obtained a legally valid vested interest until he paid for the land.[12] Thus, the agency interpretation of the Color-of-Title Act finding that Lipscomb did not acquire vested title to the land until he paid the purchase price is reasonable, and the district court was correct in deferring to it.[13]

Because Lipscomb did not acquire title to the property until October 1, 1985, it follows that he did not acquire title to the minerals underlying the land until that date. To hold that Lipscomb is entitled to the minerals withdrawn before October 1 when he did not hold title to them again

11. Lipscomb argues that the General Pre-emption Act was not the predecessor to the Color-of-Title Act because the sale of lands under the General Preemption Act was discretionary. Even if this argument had merit, it would not affect the above analysis. We do not use the Supreme Court's interpretations of the General Preemption Act as binding precedents, but as interpretational guides.

12. Lipscomb argues that if all a claimant receives at the time he files his application is a preference in purchase, the distinction between mandatory class one and discretionary class two applications becomes meaningless. Lipscomb misunderstands the distinction. While the filing of both types of applications gives the claimant preference, the granting of a class one patent is mandatory upon meeting the statutory qualifications, while the granting of a class two patent is discretionary. The mandatory/discretionary distinction does not exist at the *filing* stage, but at the *patent issuance* stage.

13. Lipscomb maintains that *Payne v. New Mexico,* 255 U.S. 367, 41 S.Ct. 333, 65 L.Ed. 680 (1921) and *Wyoming v. United States,* 255 U.S. 489, 41 S.Ct. 393, 65 L.Ed. 742 (1921) mandate the opposite result. This is incorrect. *Payne* held that the words "subject to the approval of the Secretary of the Interior" in the statutes which entitled New Mexico to select lands in lieu of those granted to the state for schools did not authorize the Secretary to cancel selections lawfully made. 255 U.S. at 371, 41 S.Ct. at 334. *Wyoming* held that once a claimant paid the purchase price on land under lieu selection or lease, patent vested, and no subsequent discoveries of mineral rights could divest or disturb the vested interest. 255 U.S. at 500–502, 41 S.Ct. at 396–397. Both cases state that rights become vested under the selection process when the party has complied with all of the terms and conditions necessary to secure title; that is exactly what the IBLA and the district court found under the Color-of-Title Act.

would run afoul of section 2409a(g)'s clear prohibition on acquisition of government land by adverse possession. The rationale behind this conclusion may be made clearer by analogizing ownership of the mineral rights to ownership of the land itself. Had the government sold five acres of the property on September 15, 1985, and charged Lipscomb for only thirty-six acres on October 1, 1985, Lipscomb would not have been entitled to the purchase price of the five acres, because he did not hold title to the five acres on September 15 and did not pay for them. In the same way, the government's choice to lease the mineral rights to Amoco prior to October 1, 1985, did not deprive Lipscomb of property, because he did not own the mineral rights before October 1, 1985. On that date, he became the owner of any minerals remaining on the property, but he did not own any minerals removed prior to that date.[14]

Not only did Lipscomb not hold legal title to the minerals, but he did not pay for them. The land was reappraised to reflect Amoco's depletion of the mineral reserves, and the purchase price which Lipscomb paid did not include the minerals already withdrawn. Lipscomb argues that he was not aware that the purchase price he paid did not include the exploited minerals, and that he should not be penalized for his ignorance. He also argues that the Secretary's method of calculating purchase price, which did not require him to pay the full amount, was not based on the withdrawal by Amoco of the minerals, but was based on other equitable considerations.[15] There is no support in the record for the second argument. As to the first argu-

ment, it was illogical for Lipscomb to believe that he was purchasing something on October 1, 1985 that was no longer part of the property. Further, Lipscomb presumably received copies of the various appraisal reports, and so should have known what he was paying for. Finally, there is no evidence that if Lipscomb had known that his purchase price did not include the previously extracted oil, he would have been willing to pay extra to include it.[16]

There are other reasons why the IBLA's decision is correct in light of Lipscomb's particular circumstances. First, Lipscomb's original application, filed in October 1982, was a class two application. Grant of class two patents is discretionary; there was no guarantee that Lipscomb would receive a patent even if he met all of the class two qualifications. He did not file his class one application until January 27, 1984, at which time he became guaranteed that he would receive the land if he met the class one qualifications. Yet he claims ownership of all of the escrow funds, dating back to 1982. Even if Lipscomb's interpretation of the Act were adopted by this Court, he would not be entitled to the entire escrow proceeds.

■ Second, Lipscomb's argument that he is entitled to the extracted minerals is contradicted by the language of section 1068b. That section states that if a person has requested a class one patent with no mineral reservation and if that person has complied with the section 1068 requirements since January 1, 1901, no mineral reservation may be made *unless* the lands

---

**14.** In essence, what Lipscomb is claiming is an action under the common law doctrine of waste. "[W]here a tenant in common commits such waste or does other acts that amount to a destruction of the common property or that will result in its permanent injury, a cotenant is entitled to injunctive relief." *Foshee v. Foshee,* 278 Ala. 205, 177 So.2d 99, 101 (1965). The rationale behind the waste rule is clear—when two tenants jointly own property, one cannot perpetrate waste without interfering with the legal rights of the other. In the present case, however, Lipscomb was not a cotenant of the government, regardless of the duration of his years upon the land. Until he met the statutory requirements for acquisition of title, he had no

legal property right and the government owed him no duty to prevent or avoid waste.

**15.** The Secretary may adjust the purchase price to take into account equitable considerations. 43 U.S.C.A. § 1068a.

**16.** It is worth noting that even if we had found that the IBLA's decision was an abuse of discretion because the IBLA based its decision on the purchase price, the remedy would not entail transferring the escrow funds to Lipscomb. The plat simply would be re-appraised, and Lipscomb would have to pay a different purchase price.

are subject to a mineral withdrawal or an outstanding mineral lease. Thus, if a mineral lease already has been granted at the time the 1068 requirements are met, the mineral rights need not be transferred to the purchaser when the surface rights are transferred, even if the patent conditions have been met. Had there been no outstanding mineral lease, section 1068b makes transfer of mineral rights mandatory only when the claimant or his predecessor has adversely possessed the land since January 1, 1901; it is not clear that Lipscomb has done so.[17]

## III. CONCLUSION

For the above reasons, the district court's grant of summary judgment in favor of the federal defendants is AFFIRMED. The district court's order that the funds accruing prior to August 15, 1985 be declared the property of the United States, however, is REMANDED for the district court to change the judgment to reflect the fact that Lipscomb owns the right to all moneys deposited in the escrow account from the date that he paid the purchase price on the land, October 1, 1985.

---

17. Lipscomb cites *Locke v. Locke,* 291 Ala. 344, 280 So.2d 773 (1973) for the proposition that minerals in place are part of the real estate. This state law case is not applicable; federal law governs the construction of a patent under the Color-of-Title Act, as well as the "quantum of the premises which it conveys." *Ritter v. Morton,* 513 F.2d 942, 946 (9th Cir.), *cert. denied sub nom. Ritter v. Kleppe,* 423 U.S. 947, 96 S.Ct. 362, 46 L.Ed.2d 281 (1975) (citing *Hughes v. Washington,* 389 U.S. 290, 88 S.Ct. 438, 19 L.Ed.2d 530 (1967); *United States v. Oregon,* 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267 (1935)). Further, Lipscomb did obtain title to the minerals in place at the time his interest vested. What he wants is title to minerals no longer in place, and the above cases do not mandate such relief.